1 | Ellen A. Cirangle (SBN 164188)
Jonathan Sommer (SBN 209179)
2 | STEIN & LUBIN LLP
Transamerica Pyramid
3 | 600 Montgomery Street, 14th Floor
San Francisco, California 94111
4 | Telephone:    (415) 981-0550
Facsimile:    (415) 981-4343
5 | ecirangle@steinlubin.com
jsommer@steinlubin.com

6 |
Jeffrey A. Hall (admitted *pro hac vice*)
7 | Ashley C. Keller (admitted *pro hac vice*)
Bartlit Beck Herman Palenchar & Scott LLP
8 | 54 West Hubbard, Suite 300
Chicago, IL 60654
9 | Telephone: (312) 494-4400
Facsimile: (312) 494-4440
10 | jeffrey.hall@bartlit-beck.com
ashley.keller@bartlit-beck.com

11 |
Joseph C. Smith, Jr. (admitted *pro hac vice*)
12 | Bartlit Beck Herman Palenchar & Scott LLP
1899 Wynkoop St., Suite 800
13 | Denver, CO  80202
Telephone: (303) 592-3100
14 | Facsimile: (303) 592-3140
joseph.smith@bartlit-beck.com

15 | Attorneys for Defendant
MORTGAGE GUARANTY INSURANCE CORPORATION

16 |

17 |

18 |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

19 |

| | |
|---|---|
| COUNTRYWIDE HOME LOANS, INC., and BAC HOME LOANS SERVICING, LP (formerly Countrywide Home Loans Servicing, LP), <br><br> Plaintiffs, <br><br> v. <br><br> MORTGAGE GUARANTY INSURANCE CORPORATION, <br><br> Defendant. | Case No. C 10 0233 JSW <br><br> **DECLARATION OF ASHLEY C. KELLER IN SUPPORT OF DEFENDANT'S NOTICE OF MOTION AND MOTION TO STAY ACTION PENDING RESOLUTION OF ARBITRATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:    December 2, 2011 <br> Time:    9:00 a.m. <br> Place:    Crtrm. 11, 19th Fl. <br><br> Judge:    Honorable Jeffrey S. White |

27 |

28 |

52370002/419258v2                                                                Case No. C 10 0233 JSW

DECLARATION OF ASHLEY C. KELLER IN SUPPORT OF DEFENDANT'S NOTICE OF MOTION AND MOTION TO
STAY ACTION PENDING RESOLUTION OF ARBITRATION; MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT THEREOF

1    I, Ashley C. Keller, declare that:

2        1.    I am counsel of record for defendant Mortgage Guaranty Insurance Corp.

3    ("MGIC") and admitted *pro hac vice* in the above-referenced action. I have personal knowledge

4    of the matters stated in this declaration and could and would competently testify thereto if called

5    upon as a witness at trial or any other proceeding in this matter.

6        2.    MGIC filed its demand for arbitration on February 24, 2010. During an

7    August 18, 2010 telephone call between the parties and the arbitration panel, Plaintiffs requested

8    that the arbitration not proceed.

9        3.    On July 11, 2011, MGIC filed a re-notice of motion to stay action pending

10   resolution of arbitration in the United States District Court for the Northern District of California.

11   On August 29, 2011, the district court issued an order striking the pending motion to stay and

12   vacating the hearing set for September 16, 2011.

13       4.    A true and correct copy of the Mortgage Guaranty Master Policy or "Flow

14   Policy" is attached hereto as Exhibit A.

15       5.    A true and correct copy of the demand for arbitration with the American

16   Arbitration Association dated February 24, 2010 is attached hereto as Exhibit B.

17

18       I declare under penalty of perjury of the laws of the State of California that the foregoing

19   is true and correct.

20       Executed this 9th of September 2011, in Chicago, Illinois.

21

22                                              Ashley C. Keller

23

24

25

26

27

28   52370002/419258v2                    1                    Case No. C 10 0233 JSW

DECLARATION OF ASHLEY C. KELLER IN SUPPORT OF DEFENDANT'S NOTICE OF MOTION AND MOTION TO
STAY ACTION PENDING RESOLUTION OF ARBITRATION; MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT THEREOF

# EXHIBIT A

EX-99.1 17 c48611cxv99w1.htm EX-99.1

**EXHIBIT 99.1**

**Mortgage Guaranty Insurance Corporation**                              **MGIC**
250 E. Kilbourn Avenue
P.O. Box 488, Milwaukee, Wisconsin 53201-0488

## Restated to include selected standard endorsements in place as of February 25, 2009

### Declaration Page for Use With
### Mortgage Guaranty Master Policy

Mortgage Guaranty Insurance Corporation (a stock insurance company hereinafter called the "Company") agrees to pay to the Insured identified below, in consideration of the premium or premiums to be paid as specified in this Policy and in reliance on the Insured's Application for coverage under this Policy any Loss due to the Default by a Borrower on a Loan, subject to the terms and conditions in this Policy.

Insured's Name and Mailing Address                    Master Policy Number

                                                       Effective Date of Policy

Includes Terms and Conditions

Includes Endorsement(s):

**In Witness Whereof,** the Company has caused its Corporate Seal to be hereto affixed and these presents to be signed by its duly authorized officers in facsimile to become effective as its original seal and signatures and binding on the Company.

### MORTGAGE GUARANTY INSURANCE CORPORATION

President                    [Corporate Seal]                    Secretary

                           Authorized Representative

## Table of Contents
## Mortgage Guaranty Master Policy

1    Definitions

    1.1    Application
    1.2    Appropriate Proceedings
    1.3    Borrower
    1.4    Borrower's Title
    1.5    Certificate
    1.6    Certificate Effective Date
    1.7    Claim
    1.8    Claim Amount
    1.9    Commitment
    1.10   Default
    1.11   Environmental Condition
    1.12   Good and Merchantable Title
    1.13   Insured
    1.14   Loan
    1.15   Loss
    1.16   Owner or Owner of the Loan
    1.17   Perfected Claim
    1.18   Person
    1.19   Physical Damage
    1.20   Policy
    1.21   Possession of the Property
    1.22   Property
    1.23   Residential
    1.24   Servicer
    1.25   Settlement Period
    1.26   Value
    1.27   Eligibility Criteria

2    Obtaining Coverage and Payment of Premiums

    2.1    Application and Certificate
    2.2    Representations of the Insured
    2.3    Company's Remedies for Misrepresentation
    2.4    Incontestability for Certain Misrepresentations
    2.5    Initial Premium and Term of Coverage
    2.6    Renewal of Certificate and Termination for Non-Payment of Renewal Premium;
           Reinstatement of Terminated Coverage
    2.7    Special Procedures for Certification of Coverage; Payment of Initial and Renewal Premiums
    2.8    Cancellation by the Insured of a Certificate
    2.9    Cancellation of Policy
    2.10   Relationship Among the Company, the Owner of a Loan, and the Servicer of a Loan
    2.11   Refund of Premium for Denial of Claim in Full

    Changes in Various Loan Terms, Servicing and Insured; Co-ordination and Duplication of
3    Insurance Benefits

    3.1    Loan Modifications
    3.2    Open End Provisions
    3.3    Assumptions
    3.4    Change of Servicing
    3.5    Change of Owner
    3.6    Co-ordination and Duplication of Insurance Benefits

4    Exclusions From Coverage

    4.1    Balloon Payment
    4.2    Effective Date
    4.3    Incomplete Construction
    4.4    Fraud, Misrepresentation and Negligence
    4.5    Non-Approved Servicer
    4.6    Physical Damage (Other than Relating to Pre-Existing Environmental Conditions)
    4.7    Pre-Existing Environmental Conditions
    4.8    Down Payment
    4.9    First Lien Status
    4.10   Breach of the Insured's Obligations or Failure to Comply with Terms
    4.11   Non-Eligible Loans

5    Conditions Precedent to Payment of Claim

    5.1    Notice of Default
    5.2    Monthly Reports
    5.3    Company's Option to Accelerate Filing of a Claim
    5.4    Voluntary Conveyance
    5.5    Appropriate Proceedings
    5.6    Mitigation of Damages
    5.7    Advances
    5.8    Claim Information and Other Requirements
    5.9    Acquisition of Borrower's Title Not Required
    5.10   Sale of a Property by the Insured Before End of Settlement Period
    5.11   Foreclosure Bidding Instructions Given by the Company
    5.12   Effect of Unexpired Redemption Period on Payment of a Claim
    5.13   Collection Assistance

6    Loss Payment Procedure

    6.1    Filing of Claim
    6.2    Calculation of Claim Amount
    6.3    Payment of Loss; Company's Options
    6.4    Calculation of Settlement Period
    6.5    Payment by the Company After the Settlement Period
    6.6    Discharge of Obligation

7    Additional Conditions

    7.1    Proceedings of Eminent Domain
    7.2    Pursuit of Deficiencies
    7.3    Subrogation
    7.4    Policy for Exclusive Benefit of the Insured and the Owner
    7.5    Effect of Borrower Insolvency or Bankruptcy on Principal Balance
    7.6    Arbitration of Disputes; Suits and Actions Brought by the Insured
    7.7    Release of Borrower; Defenses of Borrower
    7.8    Amendments; No Waiver; Rights and Remedies; Use of Term "Including"
    7.9    No Agency
    7.10   Successors and Assigns
    7.11   Applicable Law and Conformity to Law
    7.12   Notice
    7.13   Reports and Examinations
    7.14   Electronic Media

Case 3:10-cv-00233-JSW   Document 60   Filed 09/09/11   Page 9 of 56
EX-99.1                                                                                      Page 6 of 29
Case3:10-cv-00233-JSW   Document25-1   Filed02/25/10   Page7 of 30

### Terms and Conditions

**1   Definitions**

1.1 **Application** means a request for coverage, including assumption of coverage, under this Policy for a Loan on a form or in a format provided by the Company, and all other statements, documents or information furnished to the Company by the Insured or any other Person in connection with the insuring of the Loan. An application will include information, if so furnished to the Company, contained in the Borrower's Loan application, appraisal, verifications of income and deposit, plans and specifications for the Property, and all other exhibits and documents, and will include all data and information so furnished by electronic means.

1.2 **Appropriate Proceedings** means any legal or administrative action by the Insured affecting either a Loan or title to a Property, including:

   a.   Preserving a deficiency recovery by making a bid at the foreclosure sale and pursuing a deficiency judgment until the end of the Settlement Period, where appropriate and permissible and where directed by the Company; or

   b.   Enforcing the terms of the Loan as allowed by the laws where the Property is located; or

   c.   Acquiring Borrower's Title or Good and Merchantable Title to the Property, as either may be required under this Policy, but excluding such title as may be acquired by a voluntary conveyance from the Borrower; or

   d.   Asserting the Insured's interest in the Property in a Borrower's bankruptcy.

1.3 **Borrower** means any Person legally obligated to repay the debt obligation created by a Loan, including any co-signer or guarantor of the Loan.

1.4 **Borrower's Title** means such title to a Property as was vested in the Borrower at the time of a conveyance to the Insured arising out of or pursuant to a foreclosure of the Loan; provided, however, if the Insured so elects, the redemption period need not have expired. Borrower's Title in the Insured may be, but need not be the equivalent of Good and Merchantable Title, and the deed evidencing Borrower's Title need not be recorded unless required by applicable law.

1.5 **Certificate** means the document, which may be on the same form as the Commitment, issued by the Company pursuant to this Policy and extending the coverage indicated therein to a specified Loan.

1.6 **Certificate Effective Date** means, as specified in the Certificate, (a) the closing date of a Loan, or (b) the later date requested by the Insured and accepted by the Company.

1.7 **Claim** means the timely filed written request, made on a form or in a format provided or approved by the Company, to receive the benefits of this Policy.

1.8 **Claim Amount** means the amount calculated in accordance with Section 6.2 of this Policy.

1.9 **Commitment** means the document, which may be on the same form as the Certificate, issued by the Company evidencing the Company's offer to insure the Loan identified therein, subject to the terms and conditions therein and in this Policy.

1.10 **Default** means the failure by a Borrower (a) to pay when due an amount equal to or greater than one (1) monthly regular periodic payment due under the terms of a Loan or (b) to pay all amounts due on acceleration of the Loan by the Insured after breach by the Borrower of a due on sale provision in the Loan, granting the Insured the right to accelerate the Loan upon transfer of title to, or an interest in, the Property and to institute Appropriate Proceedings. Violation by the Borrower of any other term or condition of the Loan which is a basis for Appropriate Proceedings shall not be considered to be a Default.

A Loan is deemed to be in Default for that month as of the close of business on the installment due date for which a scheduled monthly payment has not been made or as of the close of business on the due date stated in the notice of acceleration given pursuant to the due-on-sale provision in the Loan. The Loan will be considered to remain in Default until filing of a Claim so long as such periodic payment has not been made or such basis for Appropriate Proceedings remains. For example, a Loan is "four (4) months in Default" if the monthly installments due on January 1 through April 1 remain unpaid as of the close of business on April 1 or if a basis for acceleration and Appropriate Proceedings exists for a continuous period of four months.

1.11 **Environmental Condition** means the presence of environmental contamination, including nuclear reaction or radioactive waste, toxic waste, or poisoning, contamination or pollution of earth or water subjacent to the Property or of the atmosphere above the Property; or the presence, on or under a Property, of any "Hazardous Substance" as that term is defined by the federal Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. Sec. 9601 et. seq., as amended from time to time) or as defined by any similar state law, or of any "Hazardous Waste" or "Regulated Substance" as those terms are defined by the federal Resource Conservation and Recovery Act (42 U.S.C. sec. 6901, et seq., as amended from time to time) or as defined by any similar state law. Environmental Condition does not mean the presence of radon, lead paint, or asbestos.

1.12 **Good and Merchantable Title** means title to a Property free and clear of all liens, encumbrances, covenants, conditions, restrictions, easements and rights of redemption, except for any of the following or as permitted in writing by the Company:

   a. Any lien established by public bond, assessment or tax, when no installment, call or payment of or under such bond, assessment or tax is delinquent;

   b. Any municipal and zoning ordinances and exceptions to title waived by the regulations of federal mortgage insurers and guarantors with respect to mortgages on one-to-four family residences in effect on the date on which the Loan was closed and all documents were executed; and

   c. Any other impediments which will not have a materially adverse effect on either the transferability of the Property or the sale thereof to a bona fide purchaser.

   Good and Merchantable Title will not exist if (i) there is any lien pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, or similar federal or state law, as in effect from time to time, providing for liens in connection with the removal and clean-up of environmental conditions, or if notice has been given of commencement of proceedings which could result in such a lien, or (ii) there are limitations on ingress and egress to the Property or on use of utilities. Any action or proceeding after a foreclosure sale relating to establishing a deficiency judgment will not be considered in determining whether the Insured has acquired Good and Merchantable Title.

1.13 **Insured** means:

   a. The Person designated on the face of this Policy; or

   b. The initial or subsequent Owner of the Loan, upon request by the Owner to become the Insured; or

   c. The initial or subsequent Servicer of the Loan, if the Owner is not the Insured, upon request by the Servicer to become the Insured or designation by the Owner of such Servicer as the Insured.

   If the Company has not been notified in writing of a change of Insured, the Company's sole obligation hereunder shall be to the named Insured, except as specifically provided in this Policy. The Company may rely upon notice from a Person that it or its designee is the new Insured, but the Company must provide notice of such change to the prior Insured.

1.14 **Loan** means any note, bond, or other evidence of indebtedness secured by a mortgage, deed of trust, or other similar instrument, which constitutes or is equivalent to a first lien or charge on a Property and which the Company has approved for insurance and to which coverage under this Policy has been extended.

Page 2

Case 3:10-cv-00233-JSW    Document 60    Filed 09/09/11    Page 11 of 56
EX-99.1                                                                          Page 8 of 29
           Case3:10-cv-00233-JSW   Document25-1   Filed02/25/10   Page9 of 30

Case 3:10-cv-00233-JSW    Document 60    Filed 09/09/11    Page 12 of 56
EX-99.1                                                                    Page 9 of 29
Case3:10-cv-00233-JSW  Document25-1    Filed02/25/10  Page10 of 30

1.15 **Loss** means the liability of the Company with respect to a Loan for payment of a Perfected Claim which is calculated in accordance with Section 6.3. A Loss will be deemed to have occurred when a Default on a Loan occurs, even though the amount of Loss is not then either presently ascertainable or due and payable.

1.16 **Owner or Owner of the Loan** means the Person who owns a Loan and of whom the Company is notified in accordance with this Policy.

1.17 **Perfected Claim** means a Claim received by the Company which contains all information or proof required by the Company and for which all requirements of this Policy applicable to payment of a Claim are satisfied.

1.18 **Person** means any individual, corporation, partnership, association or other entity.

1.19 **Physical Damage** means any tangible injury to a Property, whether caused by accident, natural occurrence, or any other reason, including damage caused by defects in construction, land subsidence, earth movement or slippage, fire, flood, earthquake, riot, vandalism or any Environmental Condition.

1.20 **Policy** means this contract of insurance and all Applications, Commitments, endorsements, schedules, and Certificates, which are incorporated in this Policy, related to Loans insured under this Policy.

1.21 **Possession of the Property** means, if the Company elects to acquire the Property, physical and undisputed occupancy and control of the Property at the time of acquisition.

1.22 **Property** means a Residential real property and all improvements thereon which secure a Loan, together with all easements and appurtenances, all rights of access, all rights to use common areas, recreational and other facilities, and all of their replacements or additions.

1.23 **Residential** means a type of building or a portion thereof which is designed for occupancy by not more than four (4) families, or a single-family condominium, or a unit in a planned unit development.

1.24 **Servicer** means that Person acting on behalf of the Owner of a Loan (or on behalf of the Owner's designee, if any) to service the Loan and of whom the Company has been notified. The Servicer acts as a representative of the Owner of the Loan (and the Owner's designee, if any) and will bind the Owner and its designee for all purposes of this Policy, including providing information to the Company, receiving any notices, paying premiums, accepting Loss payments, and performing any other acts under this Policy. References in this Policy to a Servicer's obligations will not be construed as relieving the Owner or its designee of responsibility for the Servicer's performance.

Unless otherwise agreed to in writing by the Company or otherwise required pursuant to the terms of this Policy, if there is a Servicer for a Loan and the Servicer is not the Insured the Company shall be entitled to rely upon and treat the Servicer as the representative of the Insured with respect to communications, paying premiums, accepting Loss payments and for all other purposes of this Policy. However, with respect to assignment of coverage and cancellation of a Certificate, the Company shall be entitled to rely upon instruction from either the Servicer or the Insured. The Servicer may designate the Owner as the payee for any Loss.

1.25 **Settlement Period** means the sixty (60) day period as determined under Section 6.4, at the end of which a Loss is payable by the Company; provided that if the Company pays a Loss prior to expiration of such sixty (60) day period, the Settlement Period ends with such payment.

1.26 **Value** means the lesser of the sales price of a Property (only applicable in the case of a Loan to finance the purchase of such Property) or appraised value of the Property as set forth in the Certificate.

1.27 **Eligibility Criteria** means the requirements which may be established by the Company from time to time applicable to qualification of a Loan for insurance under this Policy (including approved mortgage loan programs, maximum loan-to-value ratios and original principal amounts, coverage limitations, underwriting requirements and payment status) and of which the Company advises the Insured by notice to the Insured as provided for in this Policy or by general publication in underwriting guides, premium rate cards, or other written or electronic communications prior to the Loan becoming insured. The Company from time to time may amend the requirements which have been established and shall advise or notify the Insured prior to such amendment becoming effective.

Any pronouns, when used in this Policy, will mean the singular or plural, masculine or feminine, as the case

may be.

**2   Obtaining Coverage and Payment of Premiums**

2.1 **Application and Certificate** — In order to insure a Loan under this Policy, the Insured or a Person
acting on behalf of the Insured must submit to the Company a properly completed Application. Approval
of any Application will be at the discretion of the Company and will be in the form of a Commitment or a
Certificate which offers to extend, or extends coverage under the terms and conditions of both this Policy
and the Commitment or Certificate, as the case may be.

In lieu of such an Application and supporting statements, documents and information submitted to the

Page 3

Company in connection with insuring a Loan, the Company may accept an alternative form of Application, containing more limited information, including certifications by or on behalf of the Insured as to characteristics of a Loan in lieu of supporting statements, documents and information. The Company shall be entitled to fully rely on such alternative Application as submitted. Use of an alternative form of Application shall not waive or change the other terms and conditions of this Policy under which a Loan is insured or the responsibility of the Insured for the accuracy of statements, documents and information submitted by it or other Persons to the Company as provided in this Policy.

If the Company declines to approve a mortgage loan, it will not issue a Commitment or Certificate, and it will notify the Insured in writing of such declination. If the Insured or the Person acting on its behalf subsequently denies the mortgage loan application which it received from the applicant, the Insured or such Person will be responsible for notifying the applicant that the Company declined to approve the mortgage loan. Such notification will be made in compliance with any applicable state or federal laws or regulations, including the Equal Credit Opportunity Act and any other similar law or regulation.

2.2 **Representations of the Insured** — The Insured represents that:

a.  all statements made and information provided to the Company in an Application or in any Commitment or Certificate (including as such is related to continuation of coverage upon assumption of a Loan), whether by it, the Borrower, or any other Person, have been made and presented for and on behalf of the Insured;

b.  such statements and information are not false or misleading in any material respect as of the date(s) on which they are made or provided and do not omit any fact necessary in order to make such statements and information not false or misleading in any material respect as of such date(s); and

c.  the Loan complies with the Eligibility Criteria in effect at the time the Application is submitted to the Company. For purposes of this subparagraph (c), Section 2.4 of this Policy shall not apply to a determination as to whether a Loan complies with the Eligibility Criteria.

It is understood and agreed that such statements and information in the aggregate are, and in certain instances individually may be, material to the Company's decision to offer, provide or so continue coverage of the related Loan; the Company issues the related Commitment and Certificate or continues coverage in reliance on the accuracy and completeness of such statements and information and without any obligation to independently verify the statements and information submitted to it; and the Company's reliance on the representations in Section 2.2(a) and (b) above survive the issuance of a Commitment and Certificate or such continuation of coverage.

Without otherwise limiting the scope of this Section 2.2, a breach of Section 4.8 relating to down payment will be deemed a material misrepresentation for purposes of this Section 2.2. The foregoing representations shall be effective whether or not they are made by the Insured or other Person with the intent to deceive or mislead, or with the knowledge that they are not true and correct.

2.3 **Company's Remedies for Misrepresentation** — Subject to Section 2.4, if any of the Insured's representations as described in Section 2.2 are materially false or misleading with respect to a Loan, the Company will have at its option, the right to defend against a Claim, or to the extent permitted by applicable law, to cancel or rescind coverage under any Certificate retroactively to commencement of coverage (or if the misrepresentation occurs with respect to continuation of coverage upon assumption of a Loan, to so defend, cancel or rescind retroactively to the date of such continuation). In the case of such cancellation or rescission, the Company shall return at that time all paid premiums retroactively to such applicable date.

2.4 **Incontestability for Certain Misrepresentations** — Notwithstanding Sections 2.2 or 2.3, no Claim for Loss will be denied or adjusted, nor will the Certificate's coverage be rescinded or canceled, by reason of any misrepresentations (whether by statements made or omitted) contained in an Application, provided that all of the following requirements, conditions and circumstances, to the extent not waived in writing at the option of the Company, are satisfied:

Page 4

Case 3:10-cv-00233-JSW    Document 60    Filed 09/09/11    Page 15 of 56
EX-99.1                                                                Page 12 of 29
Case3:10-cv-00233-JSW  Document25-1   Filed02/25/10  Page13 of 30

a.  The misrepresentation must not have been:

1.  knowingly made, or knowingly participated in, by:

    (i)   the Insured or any other Person which originated the Loan;

    (ii)  a correspondent lender, mortgage loan broker or other intermediary underwriting or processing the Loan on behalf of the Insured or of any other Person which originated the Loan; or

    (iii) an escrow or closing agent, or any other agent of, or broker for, the Insured or any other Person which originated the Loan acting with respect to the Loan or the related Property transaction; or

2.  made, whether or not knowingly, by an appraiser, provider of an automated valuation model, or any other Person providing a valuation of the Property that is used in underwriting, processing or originating the Loan and that is submitted to the Company for the purpose of establishing the Value of the Property.

b.  This Section 2.4 will not apply to a Certificate if within twelve (12) months before or after a material misrepresentation by a Borrower or other Person (other than those Persons identified in Section 2.4 (a)), there are one or more material misrepresentations in a request or submission for coverage and statements, documents, data and information provided to the Company in connection with insuring a mortgage loan under any policy of insurance issued by the Company (i) with respect to three (3) or more other mortgage loans insured at any time by the Company for the Insured or any other lender and (ii) which result from the direct or indirect acts or omissions of the same Borrower or same other Person (including any other Person acting directly or indirectly in concert).

c.  This Section 2.4 shall not be construed to limit the applicability of Section 4.4(b) to a misrepresentation which is subject to this Section 2.4.

d.  The Company's payment of a Claim will not limit any rights which the Company has against the Borrower or any other Person (other than the Insured) for any misrepresentation.

## 2.5  Initial Premium and Term of Coverage

a.  Within fifteen (15) days from the Certificate Effective Date, or such other date as the Company and the Insured may agree to in writing, the Insured must forward to the Company the appropriate initial premium. Payment of the initial premium shall be a condition precedent to coverage being extended to the Loan. Subject to cancellation by the Insured or the Company as provided in this Policy, coverage shall remain in full force and effect for the period covered by the initial premium. Tender of the initial premium will constitute a representation for purposes of Section 2.2 by the Insured that any special conditions included by the Company in the related Commitment have been satisfied and that no payment which is then due under the Loan is more than thirty (30) days past due.

b.  The Company will not rescind or cancel coverage, or deny or adjust a Claim for Loss, with respect to a Loan on the basis of a failure to satisfy a special condition (other than a special condition relating to completion of construction, as described in Section 4.3 or to rehabilitation or repairs) if the Borrower has made twenty-four (24) consecutive full installment payments from the Borrower's own funds. The terms "installment payments," "consecutive," and "Borrower's own funds" shall have the meanings provided in Section 2.4(b).

## 2.6  Renewal of Certificate and Termination for Non-Payment of Renewal Premium; Reinstatement of Terminated Coverage

a.  The Company must give the Insured prior notice of the due date for payment of the applicable renewal premium payable for continued coverage of each Certificate. The entire renewal premium must be paid

Page 5

within a forty-five (45) day grace period (or such longer grace period generally allowed by the Company) after the due date for payment. Upon payment of the entire renewal premium within such grace period, the Certificate will be deemed renewed for the applicable renewal period and a Default occurring within said grace period which is not cured, and which results in a Claim being filed, will be covered.

If a Default occurs prior to the date through which the applicable premium has been paid, and if such Default is not cured and results in a Claim being filed, such Default shall remain covered and no further premium shall be due in order to maintain coverage of such Default.

With respect to a Loan with renewal premiums due on an annual basis, if the annual renewal premium is not paid within such grace period (but subject to the Owner's right to cure non-payment as provided in (b) of this Section 2.6), the coverage of the Certificate and the Company's liability will terminate effective as of 12:01 a.m. on the first day following the date through which the applicable premium has been paid and as a result, any Default occurring after the date through which the applicable premium has been paid will not be covered.

With respect to a Loan with renewal premiums due on a monthly basis, if the monthly renewal premium is not paid within such grace period (but subject to the Owner's right to cure non-payment as provided in (b) of this Section 2.6), the coverage of the Certificate and the Company's liability will terminate as of 12:01 a.m. on the first day following the date through which the applicable monthly premium has been paid, except that if a Default on the Loan occurs between the last date through which the applicable monthly renewal premium has been paid and the end of such grace period, the Insured shall not be required to pay renewal premiums, and coverage of such Default will continue, while such Default exists. If such Default is cured, all monthly renewal premiums not paid during the period of Default shall be payable (unless previously paid by the Insured) within forty-five (45) days or such longer period generally allowed by the Company after notice from the Company in order to continue coverage. If such Default is not cured and results in a Claim, the unpaid monthly renewal premiums through the renewal month in which such Default occurred shall be paid as provided in Section 6.3 by deduction from the Loss.

b.   If there occurs a transfer of servicing rights for a group of Loans to a new Servicer, a seizure of servicing rights by the Owner of such Loans, or a Servicer's surrender to the Owner of such servicing rights and if:

   1.   the Company terminates coverage on one or more of such Loans for nonpayment of the renewal premium; and the grace period for payment of the renewal premium provided for in Section 2.6 (a) expired after such transfer, seizure or surrender;

   2.   either the Owner of such Loans on which coverage was terminated, or the new Servicer for such Loans, certifies in writing to the Company within sixty (60) days after expiration of such grace period, that all of such Loans were serviced for the Owner at the time of nonpayment of renewal premium; and that in good faith it believes that the failure to pay the renewal premium on all such Loans was an error or omission caused by such transfer, seizure or surrender of servicing; and

   3.   either the Owner or the new Servicer of such Loans pays the entire amount of renewal premiums due and unpaid on all such Loans within such sixty day period; then

upon satisfaction of all of the foregoing conditions, the Company shall reinstate coverage on such Loans retroactively to the effective date of termination of coverage, under all of the terms and conditions in effect at termination and as if there had been no lapse in coverage.

Page 6

Case 3:10-cv-00233-JSW   Document 60   Filed 09/09/11   Page 17 of 56
EX-99.1                                                                                     Page 14 of 29
Case3:10-cv-00233-JSW   Document25-1   Filed02/25/10   Page15 of 30

2.7 **Special Procedures for Certification of Coverage; Payment of Initial and Renewal Premiums**

    a.   The Company may permit coverage of a Loan to be certified and become effective without the Insured's return of an executed Commitment or Certificate, but coverage will only become effective if within fifteen (15) days after the Certificate Effective Date (or such longer period as the Company may allow) the Insured provides the Company with the Certificate Effective Date and other information required by the Company, and pays the required premium. If signature and return of an executed Commitment or Certificate is not required, the Insured will nevertheless be automatically deemed to have made all certifications, representations and statements attributable to it in the form of the Commitment or Certificate, as though, and to the same extent as if, the Insured had executed and returned the Commitment or Certificate.

    b.   The Insured acknowledges that the Company deposits initial and renewal premium checks immediately upon receipt and agrees that the receipt and deposit of a premium check by the Company after the time specified in this Policy for receipt, does not constitute a waiver of the requirements of this Policy for timely receipt or an acceptance of premium by the Company. The Company will have the right to return such late premium payment, but only within sixty (60) days after receipt, in which case coverage will be cancelled retroactively to the Certificate Effective Date for a late initial premium, or to the last day of the period covered by the previous premium payment for a late renewal premium. Receipt, deposit and retention of a premium check will not constitute a waiver of any defenses with respect to any other matters which the Company may have under this Policy.

2.8 **Cancellation by the Insured of a Certificate** — The Insured may obtain cancellation of a Certificate by returning the Certificate to the Company or making a written request to the Company for cancellation. Upon receipt, the Company will refund, where applicable, a portion of the premium paid in accordance with the appropriate cancellation schedule which is either attached to this Policy or which will be provided by the Company to the Insured upon request. However, no refund on a Certificate will be paid if the Loan is in Default on the date the Company receives the request. Cancellation of a Certificate will not cancel this Policy.

2.9 **Cancellation of Policy** — Either the Insured or the Company may cancel their respective right or obligation to receive or issue new Commitments or Certificates under this Policy by providing thirty (30) days' written notice of cancellation of this Policy. However, Commitments and Certificates issued prior to such cancellation of this Policy will continue in force so long as all premiums are paid and all other terms and conditions of this Policy for coverage are complied with by the Insured.

2.10 **Relationship Among the Company, the Owner of a Loan, and the Servicer of a Loan** — The Company will be entitled to assume that the Insured identified on this Policy and under a Certificate is the Owner of the Loan. If the Company receives written notice acceptable to it that there is an Owner of the Loan who is not the Insured, the Company shall identify that Owner in its internal records and for purposes of this Policy. The Company shall be required to identify only one Owner for a Loan at any one time.

The Company will provide the Owner of a Loan so identified in its records with an opportunity to cure non-payment of renewal premium, as provided under Section 2.6; will notify such Owner of the Loan of a non-approved Servicer and allow replacement with a new Servicer, as provided under Section 4.5; will allow the Owner (or its designee, if any) to replace a Servicer and allow the replacement Servicer to become the Insured under Section 1.13; and will allow the Owner to become the Insured under Section 1.13 if the Owner services the Loan itself. Any Person becoming an Insured under this Policy shall be subject to all of the terms and conditions of this Policy to the same extent as any previous Insured hereunder and without regard to the extent of the knowledge or responsibility of such Person, relating to matters occurring before such Person became an Insured.

Page 7

Case 3:10-cv-00233-JSW  Document 60  Filed 09/09/11  Page 18 of 56
EX-99.1                                                                                    Page 15 of 29
Case3:10-cv-00233-JSW  Document25-1  Filed02/25/10  Page16 of 30

2.11 **Refund of Premium for Denial of Claim in Full** — If, because of a provision in Sections 2, 3 or 4 (other than Sections 4.3, 4.6, or 4.7), no Loss is payable to the Insured, the Company shall return to the Insured all paid premiums retroactively and pro rata to the date when the event or circumstance occurred which resulted in no Loss being payable.

3   **Changes in Various Loan Terms, Servicing and Owner; Co-ordination and Duplication of Insurance Benefits**

3.1 **Loan Modifications** — Unless advance written approval is provided by, or obtained from, the Company, the Insured may not make any change in the terms of a Loan, including the borrowed amount, interest rate, term or amortization schedule of the Loan, except as permitted by terms of the Loan; nor make any change in the Property or other collateral securing the Loan; nor release the Borrower from liability on a Loan.

3.2 **Open End Provisions** — The Insured may increase the principal balance of a Loan, provided that the written approval of the Company has been obtained. The Insured will pay the Company the additional premium due at the then prevailing premium rate.

3.3 **Assumptions** — If a Loan is assumed with the Insured's approval, the Company's liability for coverage under its Certificate will terminate as of the date of such assumption, unless the Company approves the assumption in writing. The Company will not unreasonably withhold approval of an assumption. It is understood that coverage will continue, and that the restriction of this Section 3.3 will not apply, if under the Loan or applicable law the Insured cannot exercise a "due-on-sale" clause or is obligated to consent to such assumption under the Loan or applicable law.

3.4 **Change of Servicing** — If the servicing rights for a Loan are sold, assigned or transferred by the Insured or the Owner, coverage of the Loan hereunder will continue provided that written notice of the new Servicer is given to the Company and the new Servicer is approved in writing by the Company. The Company shall be automatically deemed to have approved as a Servicer any person to whom the Company has issued a master policy, which has not been cancelled, providing for residential mortgage guaranty insurance.

3.5 **Change of Owner** — If a Loan or a participation in a Loan is sold, assigned or transferred by its Owner, coverage of the Loan will continue, subject to all of the terms and conditions contained in this Policy. The new Owner of the Loan will be identified in the Company's records from the date that the Company receives written notice thereof. In the case of the sale of a participation in a Loan, the Company shall be notified of only one new Owner. If there is new ownership, the Loan must continue to be serviced by a Person approved by the Company as a Servicer.

3.6 **Co-ordination and Duplication of Insurance Benefits** — The coverage under this Policy shall be excess over any other insurance which may apply to the Property or to the Loan, except for mortgage guaranty pool insurance or supplemental or second tier mortgage insurance.

4   **Exclusions From Coverage**

The Company will not be liable for, and this Policy will not apply to, extend to or cover the following:

4.1 **Balloon Payment** — Any Claim arising out of or in connection with the failure of the Borrower to make any payment of principal and/or interest due under a Loan, (a) as a result of the Insured exercising its right to call the Loan (other than when the Loan is in Default) or because the term of the Loan is shorter than the amortization period, and (b) which is for an amount more than twice the regular periodic payments of principal and interest that are set forth in the Loan (commonly referred to as a "balloon payment"). This exclusion will not apply if the Insured, the Owner of the Loan, or other Person acting on either's behalf offers the Borrower, in writing, a renewal or extension of the Loan or a new loan which (i) constitutes a first lien, (ii) is at rates and terms generally prevailing in the marketplace (but otherwise subject to Section 3.1), (iii) is in an amount not less than the then outstanding principal balance, (iv) has no decrease in the amortization period, and (v) is offered regardless of

Page 8

Case 3:10-cv-00233-JSW   Document 60   Filed 09/09/11   Page 19 of 56
EX-99.1                                                                           Page 16 of 29
Case3:10-cv-00233-JSW   Document25-1   Filed02/25/10   Page17 of 30

whether the Borrower is then qualified under the Insured's or Owner's underwriting standards. This exclusion also will not apply if the Borrower is notified of the availability of such renewal or extension of the Loan or new loan and does not accept the renewal, extension or new loan.

4.2 **Effective Date** — Any Claim resulting from a Default existing at the Certificate Effective Date or occurring after lapse or cancellation of a Certificate.

4.3 **Incomplete Construction** — Any Claim when, as of the date of such Claim, construction of a Property is not completed in accordance with the construction plans and specifications upon which the appraisal of the Property at origination of the Loan was based.

4.4 **Fraud, Misrepresentation and Negligence** — (a) Any Claim not otherwise within the scope of Section 2.3 where there was fraud or misrepresentation by the Insured with respect to the Loan, and the fraud or misrepresentation (1) materially contributed to the Default resulting in such Claim; or (2) increased the Loss, except that if the Company can reasonably determine the amount of such increase, such Claim will not be excluded, but the Loss will be reduced to the extent of such amount.

(b) Any Claim where there was negligence by the Insured with respect to the Loan, which (1) was material to either the acceptance of the risk or the hazard assumed by the Company; (2) materially contributed to the Default resulting in such Claim; or (3) increased the Loss, except that if the Company can reasonably determine the amount of such increase, such Claim will not be excluded, but the Loss will be reduced to the extent of such amount.

4.5 **Non-Approved Servicer** — Any Claim occurring when the Servicer, at time of Default or thereafter, is not approved in writing or in a list published by the Company; provided that this exclusion shall only apply if the Company notifies the Owner of the Loan in writing if a Servicer is no longer approved and if within ninety (90) days thereafter the Owner does not complete a transfer of servicing to a new Servicer approved by the Company.

4.6 **Physical Damage (Other than Relating to Pre-Existing Environmental Conditions)** — Any Claim where, at any time after the Certificate Effective Date, Physical Damage to a Property (of a type other than as described in Section 4.7 and other than reasonable wear and tear), occurs or manifests itself subject to the following provisions:

　　a. This exclusion will not apply if the Company in good faith determines that the aggregate cost of restoring all such Physical Damage is less than fifteen hundred dollars ($1,500), or such higher amount as the Company may provide from time to time.

　　b. This exclusion will apply only if such Physical Damage occurred or manifested itself (1) prior to expiration of the Settlement Period and the Company elects to acquire the related Property in settlement of a Claim; or (2) prior to the Default and was the most important cause of the Default and the Property was either uninsured for loss arising from such Physical Damage or was insured for an amount which, disregarding normal and customary deductibles not to exceed fifteen hundred dollars ($1,500) or such higher amount as the Company may provide from time to time, was insufficient to restore the Property as provided in paragraph (c) below.

　　c. The exclusion resulting from paragraph (b) will not apply if the Property is restored in a timely and diligent manner to its condition (except reasonable wear and tear) as of the Certificate Effective Date. In lieu of requiring restoration of the Property, the Company may, at its option, reduce the Claim Amount by an amount equal to the cost of such restoration.

　　d. For purposes of this Section 4.6, the Property subject to restoration will consist only of the land, improvements or personal property deemed part of the real property under applicable law; and chattel items affixed to the real property and identified in the appraisal of the Property at the time the Loan was

Page 9

made, whether or not they are deemed part of the real property.

    e.   Cost estimates relied upon by the Company in connection with this Section 4.6 shall be provided in writing by an independent party selected by the Company. The Company will furnish the Insured with any such written cost estimates, if requested by the Insured.

4.7 **Pre-Existing Environmental Conditions** — Any Claim where there is an Environmental Condition which existed on the Property (whether or not known by the Person submitting an Application for coverage of the Loan) as of the Certificate Effective Date, subject to the following provisions:

    a.   This exclusion will not apply if the existence of such Environmental Condition, or the suspected existence of such Environmental Condition, was specifically disclosed to the Company in the Application relating to the Property.

    b.   This exclusion will apply only if such Environmental Condition (1) was a principal cause of the Default, and (2) has made the principal Residential structure on the Property uninhabitable. A structure will be considered "uninhabitable" if generally recognized standards for residential occupancy are violated or if, in the absence of such standards, a fully informed and reasonable person would conclude that such structure was not safe to live in without fear of injury to health or safety.

    c.   This exclusion will not apply if the Environmental Condition is removed or remedied in a timely and diligent manner in accordance with applicable governmental standards for safe residential occupancy.

4.8 **Down Payment** — Any Claim involving a Loan which is for the purchase of the Property, and for which the Borrower did not make a down payment as described in the Application.

4.9 **First Lien Status** — Any Claim, if the mortgage, deed of trust or other similar instrument executed by the Borrower and insured hereunder did not provide the Insured at origination with a first lien on the Property.

4.10 **Breach of the Insured's Obligations or Failure to Comply with Terms** — Any Claim involving or arising out of any breach by the Insured of its obligations under, or its failure to comply with the terms of, this Policy or of its obligations as imposed by operation of law, if the breach or failure:

    a.   Materially contributed to the Default resulting in such Claim; or

    b.   Except for a breach described in Section 2.3, increased the Loss; provided that if the Company can reasonably determine the amount of such increase, such Claim will not be excluded, but the Loss will be reduced to the extent of such amount.

4.11 **Non-Eligible Loans** — Any Loan that did not meet the Eligibility Criteria in effect at the time the related Application was submitted to the Company.

## 5   Conditions Precedent to Payment of Claim

It is a condition precedent to the Company's obligation to pay a Loss that the Insured comply with all of the following requirements:

5.1 **Notice of Default** — The Insured must give the Company written notice:

    a.   Within forty-five (45) days of the Default, if it occurs when the first payment is due under the Loan; or

    b.   Within ten (10) days of either

        1.   The date when the Borrower becomes four (4) months in Default on the Loan; or

        2.   The date when any Appropriate Proceedings which affect the Loan or the Property or the Insured's or Borrower's interest therein have been started;

Case 3:10-cv-00233-JSW   Document 60   Filed 09/09/11   Page 21 of 56
EX-99.1                                                                    Page 18 of 29
Case3:10-cv-00233-JSW   Document25-1   Filed02/25/10   Page19 of 30

whichever occurs first.

5.2 **Monthly Reports** — Following a notice of Default on the Loan, the Insured must give the Company monthly reports on forms or in a format acceptable to the Company on the status of the Loan and on the servicing efforts undertaken to remedy the Default. These monthly reports may be furnished less frequently if allowed in writing by the Company and must continue until the Borrower is no longer in Default, the Appropriate Proceedings terminate, or until the Insured has acquired the Property.

5.3 **Company's Option to Accelerate Filing of a Claim** — If the Company so directs, at any time after receiving the Insured's notice of Default, the Insured must file a Claim within twenty (20) days after notice from the Company. The Company will then make a payment of Loss in accordance with the percentage guaranty option in Section 6.3(b). Thereafter, following the acquisition of Borrower's Title by the Insured, the Insured will be entitled to file a supplemental Claim at the time prescribed in Section 6.1 in an amount equal to the sum of its advances, less the deductions, all as specified in Section 6.2, to the extent not included in the payment of the initial Claim. Such supplemental Claim must be paid by the Company in accordance with Section 6.3(b). No interest shall be includable in the Claim Amount under this Section 5.3 after the date that the accelerated claim is filed. If a Loan for which the Company has paid a Claim is subsequently brought current by the Borrower, the Insured shall refund to the Company the Loss paid by the Company with respect to that Loan. If the Company exercises its option under this Section 5.3, the Company shall not have the right to direct or participate in a deficiency recovery under Section 7.2.

5.4 **Voluntary Conveyance** — The Insured may only accept a conveyance of the Property from the Borrower in lieu of foreclosure or other proceeding if the prior written approval of the Company has been obtained. Such approval shall not be considered as an acknowledgement of liability by the Company with respect to such Loan.

5.5 **Appropriate Proceedings** — The Insured must begin Appropriate Proceedings no later than when the Loan becomes six (6) months in Default unless the Company provides written instructions that some other action be taken. Such instructions may be general or applicable only to specific Loans. The Company reserves the right to direct the Insured to institute Appropriate Proceedings at any time after Default. When either defending against or bringing Appropriate Proceedings, the Insured must report their status to the Company as reasonably and expeditiously as possible.

In conducting Appropriate Proceedings, the Insured must:

a. Diligently pursue the Appropriate Proceedings once they have begun;

b. Apply for the appointment of a receiver and assignment of rents, if permitted by law and requested by the Company;

c. Furnish the Company with copies of all notices and pleadings filed or required in the Appropriate Proceedings, except as the Company may waive such requirement in writing;

d. Act and bid at the foreclosure sale in accordance with Section 5.11 so that its ability to preserve, transfer and assign to the Company its rights against the Borrower are not impaired; and so that the rights of the Company under this Policy against the Borrower are fully protected. Such rights include any rights to obtain a deficiency judgment, subject to the Company's compliance with Sections 7.2 and 7.3 relating to establishing a deficiency; and

e. When requested by the Company, furnish the Company with a written statement indicating the estimated potential Claim Amount (as computed under Section 6.2) at least fifteen (15) days before the foreclosure sale.

5.6 **Mitigation of Damages** — The Insured must actively cooperate with and assist the Company to prevent and

Page 11

mitigate the Loss, including good faith efforts by the Insured to obtain a cure of the Default, collect amounts due under the Loan, inspect and appraise the Property and effectuate the early disposition of the Property. The Company must administer this Policy in good faith.

5.7 **Advances** — The Insured must advance:

   a. Normal and customary hazard insurance premiums and real estate property taxes, in each case as due and payable;

   b. Reasonable and necessary Property protection and preservation expenses approved by the Company at the time the Company reviews the Claim, which shall not include expenditures to remove an exclusion from coverage under Section 4; and

   c. Reasonable costs to complete Appropriate Proceedings and eviction and moving of occupants, including related court expenses and attorney's fees.

5.8 **Claim Information and Other Requirements** — The Insured must provide the Company with:

   a. All information reasonably requested by the Company;

   b. A completed form furnished by or acceptable to the Company for payment of a Claim;

   c. If the Property is not being acquired by the Company: a copy of an executed trustee's or sheriff's deed (which may be unrecorded) conveying Borrower's Title to the Property to the Insured (or satisfactory evidence that the foreclosure sale has been completed if the Borrower's right of redemption has not expired); or a deed from the Borrower (which may be unrecorded) if a voluntary conveyance has been approved by the Company, conveying to the Insured the title that was required by the Company in the approval of the conveyance.

   In the event the most important cause of Default was a circumstance or event which would prevent the Insured from obtaining Good and Merchantable Title, the Insured shall instead provide the Company with evidence described in Section 5.8(d)(2) that it has acquired Good and Merchantable Title to the Property.

   d. If the Property is being acquired by the Company:

   1. a recordable deed in normal and customary form containing the customary warranties and covenants conveying to the Company or its designee Good and Merchantable Title to the Property;

   2. a title insurance policy acceptable to the Company or an attorney's opinion of title acceptable to the Company, confirming that the Insured has and can convey to the Company Good and Merchantable Title to the Property; and

   3. Possession of the Property, but only if the Company has required such Possession in writing.

   e. Access to the Property, if requested by the Company under Section 6.4 (b).

5.9 **Acquisition of Borrower's Title Not Required** — The Insured will not be required to acquire Borrower's Title to a Property if (a) the Company approves a sale of the Property prior to a foreclosure sale and such sale is closed; (b) the Company requires an early Claim filing pursuant to Section 5.3, except that such acquisition will be required as a condition to the Insured's filing of a supplemental Claim; or (c) the Property is acquired by someone other than the Insured at a foreclosure sale, as provided in Section 5.11, or thereafter pursuant to exercise of rights of redemption.

5.10 **Sale of a Property by the Insured Before End of Settlement Period**

Page 12

Case 3:10-cv-00233-JSW   Document 60   Filed 09/09/11   Page 23 of 56
EX-99.1                                                                    Page 20 of 29
Case3:10-cv-00233-JSW   Document25-1   Filed02/25/10   Page21 of 30

a.  The Insured must submit to the Company any offer to purchase a Property which it receives after
    the Company has notified the Insured that it will acquire the Property and before the end of the
    Settlement Period. The Company must then promptly notify the Insured that it will either (1) not
    approve of such offer, in which case the Company's notice to acquire the Property will remain in
    effect, or (2) approve such offer, in which case the Company's notice of acquisition will remain in
    effect, if the approved offer does not close as scheduled. The Insured shall promptly notify the
    Company if the approved offer does not close as scheduled.

b.  If the Company has not notified the Insured that it will acquire the Property, and if the Company's
    right to acquire the Property has not expired pursuant to Section 6.5 or has not been waived, the
    Insured must submit to the Company for approval any offer to purchase the Property which would
    be acceptable to the Insured. The Company shall then promptly either approve or not approve such
    offer. If the approved offer expires or is terminated, the Company shall be entitled to pay the Loss
    payable by (1) paying the percentage guaranty option as calculated under Section 6.3(b), or
    (2) paying the property acquisition settlement option as calculated under Section 6.3(a), and
    acquiring the Property; but if the Company's right to acquire the Property has expired pursuant to
    Section 6.5, or been waived, then such acquisition shall be under the same terms and conditions as
    the expired or terminated offer, except for terms and conditions relating to the sale price and method
    of payment of the sale price, which shall instead be governed by Section 6.3.

c.  The following provisions shall apply to offers submitted to the Company under this Section 5.10:

    1.  At the time it presents an offer, the Insured must also provide the Company with a good faith
        estimate of gross proceeds and expenses in sufficient detail for the Company to calculate the
        estimated net proceeds described below. The Company may not require any changes to the
        offer or direct the marketing of the Property or expenditures by the Insured for restoration of the
        Property as a condition to its approval.

    2.  If the Company approves the offer submitted by the Insured, it must also advise the Insured of
        the estimated net proceeds which it has calculated. The estimated net proceeds calculated by
        the Company will be the estimated gross sales proceeds to be received by the Insured less all
        reasonable estimated expenses submitted by the Insured and approved by the Company in its
        approval of the offer which have been or are expected to be paid by the Insured in obtaining
        and closing the sale of the Property. If the estimated net proceeds as calculated by the
        Company is acceptable to the Insured, the Loss payable shall be computed as determined
        below. If such calculation is not acceptable to the Insured, the offer shall be deemed to have
        not been approved by the Company.

    3.  If the Company approves the offer, the Loss payable by the Company under this Section 5.10
        will be the lesser of (i) the actual net amount as calculated below, or (ii) the percentage
        guaranty option under Section 6.3(b) without regard to a sale of the Property. The actual net
        amount will be the Claim Amount calculated under Section 6.2, except that (a) delinquent
        interest will be computed through the closing date for sale of the Property and (b) the Claim
        Amount shall be reduced by the actual net proceeds realized by the Insured from the sale of the
        Property. The actual net proceeds will be determined in the same manner as the estimated net
        proceeds, but on the basis of the actual sales proceeds. For purposes of computing a Loss,
        such actual net proceeds shall not be less than the estimated net proceeds calculated by the
        Company under this subparagraph (c), or as otherwise approved by the Company.

    4.  The Company shall not unreasonably withhold its approval of expenses submitted to it after its
        approval of an offer. Expenses paid to Persons employed or controlled by the Insured or the
        Owner of the Loan or their internal costs will not be allowed in calculation of either the
        estimated or actual net proceeds.

Page 13

Case 3:10-cv-00233-JSW   Document 60   Filed 09/09/11   Page 24 of 56
EX-99.1                                                            Page 21 of 29
Case3:10-cv-00233-JSW  Document25-1   Filed02/25/10  Page22 of 30

5.  If requested by the Company, the Insured shall advise the Company of the name of the real estate broker or other Person marketing the Property and authorize such broker or other Person to release marketing information about the Property to the Company, if requested by the Company.

5.11 **Foreclosure Bidding Instructions Given by the Company** — The Insured will be entitled to bid at the foreclosure sale held as part of the Appropriate Proceedings any amount which it determines necessary to obtain Borrower's Title to the Property, unless otherwise directed by the Company. The Company will be entitled to direct the Insured to bid an amount to be determined by the Insured within a minimum and maximum range, as follows:

a.  The minimum amount shall not be less than the fair market value of the Property, but if there has been Physical Damage to the Property which affects its fair market value (as determined before such Physical Damage) by more than ten per cent (10%), the fair market value of the Property shall be its fair market value after restoration of the Property.

b.  The maximum amount shall not exceed the greater of (1) the fair market value of the Property as determined under subparagraph (a) above, or (2) the estimated Claim Amount less the amount which the Company would pay as the percentage guaranty option under Section 6.3(b).

c.  For purposes of this Section 5.11, fair market value shall be determined as of a date acceptable to the Company by an opinion of an independent real estate broker, or by an independent appraiser, in either case selected by or acceptable to the Company.

The Insured is not required to acquire Borrower's Title if it has bid in accordance with this Section 5.11, whether or not pursuant to directions from the Company.

5.12 **Effect of Unexpired Redemption Period on Payment of a Claim** — If the Insured files a Claim prior to expiration of an applicable redemption period, the Loss payable shall only be computed through the date of filing of the Claim, and if the Company elects to acquire the Property, the Insured will remain responsible for management and control of the Property until the Company's acquisition thereof, which may be after expiration of the redemption period, but not later than as required by Section 6.4.

If the Company has paid to the Insured a Claim under its percentage guaranty option in Section 6.3 (b), and the related Property is subsequently redeemed by the Borrower, the Insured shall promptly report such redemption to the Company and reimburse the Company for the amount of the Company's Claim payment, to the extent that the sum of the Company's Claim payment and the amount realized by the Insured from the redemption exceeds the Claim Amount, as would have been calculated through the date of redemption.

5.13 **Collection Assistance** — If the Company so requests, the Insured shall permit the Company to cooperatively assist the Insured in the collection of moneys due under the Loan, including obtaining information from the Borrower, attempting to develop payment schedules acceptable to the Insured, conducting Property Inspections and requesting appraisals of the Property.

# 6   Loss Payment Procedure

6.1 **Filing of Claim** — The Insured shall file a Claim after, but no later than sixty (60) days following, the conveyance to the Insured of Borrower's Title to the Property. If the Insured is not required to have Borrower's Title to file a Claim for a reason described in Section 5.9, then the Claim must be filed (a) within sixty (60) days after the Property is conveyed in a pre-foreclosure sale, at the foreclosure sale, or by exercise of the rights of redemption or (b) at the time specified by Section 5.3. If the Insured fails to file a Claim within the applicable time, the Insured will not be entitled to, and the Company will not be obligated for, any payment under this Policy for amounts, including additional interest and expenses, which would otherwise be claimable, but which accrue or are incurred after the sixty (60) day period for filing of a Claim.

If the Insured fails to file a Perfected Claim on a Loan within one (1) year after, as applicable (a) the Insured acquires title to the Property, or (b) the Property is sold by the Borrower in a pre-foreclosure sale with the Company's approval or such other event occurs which is the basis for filing of a Claim under Section 6.1 (or within such longer period of time as the Company may allow in writing), the Insured will no longer be entitled to payment of a Loss on such Loan and the Company will not be obligated to make any Loss payment under this Policy with respect to such Loan.

6.2 **Calculation of Claim Amount** — Subject to Sections 7.5 and 5.3, the Claim Amount will be an amount equal to the sum of:

a. The amount of unpaid principal balance due under the Loan as of the date of Default without capitalization of delinquent interest, penalties or advances; and

b. The amount of accrued and unpaid interest due on the Loan computed at the contract rate stated in the Loan through the date that the Claim is filed with the Company, but excluding applicable late charges, penalty interest or other changes to the interest rate by reason of Default; and

c. The amount of advances incurred by the Insured under Section 5.7 prior to filing of the Claim (except to Persons employed or controlled by the Insured or the Owner of the Loan or their other internal costs) provided that:

   1. Attorney's fees advanced for completion of Appropriate Proceedings and obtaining Possession of the Property will not be allowed to the extent they exceed three percent (3%) of the sum of the unpaid principal balance and the accrued and accumulated interest due; and

   2. Such advances, other than attorney's fees, must have first become due and payable after the Default, and payment of such advances must be prorated through the date the Claim is filed with the Company;

less:

(i) The amount of all rents and other payments (excluding proceeds of a sale of the Property and the proceeds of fire and extended coverage insurance) collected or received by the Insured, which are derived from or in any way related to the Property;

(ii) The amount of cash remaining in any escrow account as of the last payment date;

(iii) The amount of cash or other collateral to which the Insured has retained the right of possession as security for the Loan;

(iv) The amount paid under applicable fire and extended coverage policies which are in excess of the cost of restoring and repairing the Property, if the Property is damaged, and which has not been paid to the Borrower or applied to the payment of the Loan as required by the terms of the Loan; and

(v) Any other amounts claimed by the Insured to the extent they are excluded from the Claim Amount by reason of Section 4.

6.3 **Payment of Loss; Company's Options** — Within the Settlement Period, but only if the Insured has satisfied all requirements for a payment of Loss and if the Company has received a Perfected Claim, the Company shall at its sole option exercise its:

a. Property acquisition settlement option. Pay to the Insured as the Loss the Claim Amount calculated in accordance with Section 6.2 for the Company's acquisition of the Property; or

b. Percentage guaranty option. Allow the Insured to retain all rights in and title to the Property, and pay to the Insured as the Loss the Claim Amount calculated in accordance with Section 6.2 of this Policy multiplied by the percentage of coverage or as otherwise calculated as specified in the Certificate. However, if prior to the Company's payment of the Loss, a third party acquires title to the Property at the foreclosure sale or a Borrower redeems the Property (unless such acquisition or redemption occurs

because the Insured failed to bid as provided in Section 5.11), then the Company shall pay the lesser of: (i) the percentage guaranty option amount described above; or (ii) the difference between the Claim Amount and the amount realized by the Insured at the foreclosure sale or redemption; or

c.  Pre-Claim sale option. Pay to the Insured as the Loss the amount calculated in accordance with Section 5.10, if the terms and conditions of Section 5.10 are met.

In addition to the sum due pursuant to the option described above which the Company selects, the Loss payable by the Company will include the other amounts provided for under Sections 6.5 or 7.2 when such Sections are applicable. The Company will deduct from its payment of Loss such amounts as may be permitted by this Policy and the aggregate amounts of any payments of Loss which it had previously made. In the event of a Loss on a Loan with renewal premiums due monthly, which results from a Default covered under Section 2.6(a), the Company shall deduct from the payment of Loss an amount equal to any unpaid renewal premiums for the subject Loan through the end of the monthly renewal period in which such Default occurred.

6.4 **Calculation of Settlement Period** — The Settlement Period will be a sixty (60) day period after the Company's receipt of a Claim, calculated as follows:

   a.  No later than the twentieth (20th) day after filing of a Claim, the Company may notify the Insured of additional documents or information which it requires for processing the Claim. The sixty-day period will be suspended until the Company receives such additional documents and information. The Company may request additional documents and information after such twenty-day period, and the Insured must use reasonable efforts to satisfy such request.

   b.  No later than the sixtieth (60th) day after filing of a Claim, the Company may notify the Insured that it will require access to the Property sufficient to inspect, appraise and evaluate the Property. If the Company does not notify the Insured by that date, its right to such access will be deemed waived. If such notice is given, the Insured will use its best efforts to provide access to the Company and, if access is not then available, the sixty day period will be suspended from the date such notice was given until the Company receives notice from the Insured that access is available to it. If access is in fact not available when sought by the Company after such notice from the Insured, the Company will promptly notify the Insured of such unavailability, and the passage of the sixty day period will remain suspended as if the Insured's notice of availability had not been given to the Company.

   c.  If the Company has elected to acquire the Property in settlement of a Claim, the sixty day period also will be suspended if necessary for there to be a period of ten (10) days after the date on which the Insured satisfies all conditions to acquisition, including any required restoration of the Property, for the Insured's delivery of a recordable deed and title policy or opinion evidencing Good and Merchantable Title (not subject to any rights of redemption, unless the Company waives such requirement) and, if applicable, delivery of Possession to the Property.

   d.  If the sixty day period is suspended for more than one reason, the resulting suspended periods will only be cumulative if in fact they occur at different times; to the extent they occur simultaneously, they will not be cumulative.

6.5 **Payment by the Company After the Settlement Period** — If the Company has not paid a Loss during the Settlement Period, then (a) the Company will include in its payment of Loss, if a Loss is ultimately payable, simple interest on the amount payable accruing after the Settlement Period to the date of payment of Loss at the applicable interest rate or rates which would have been payable on the Loan during such period, and (b) the Company will no longer be entitled to acquire the Property as an option for payment of the Loss.

The Company must either pay the amount of applicable Loss (including any additional applicable interest as computed above) or deny the Claim in its entirety within (a) one hundred twenty (120) days after expiration of the Settlement Period, or (b) if the Settlement Period has not expired, no later than one hundred eighty (180) days after filing of the Claim. If at a later date it is finally determined by agreement between the Insured and the

Page 16

Case 3:10-cv-00233-JSW   Document 60   Filed 09/09/11   Page 29 of 56
EX-99.1                                                                    Page 26 of 29
Case3:10-cv-00233-JSW   Document25-1   Filed02/25/10   Page27 of 30

Company (or by completion of legal or other proceedings to which the Insured and the Company are parties) that the Company was not entitled to deny all or a portion of the Claim, the Company will include in any resulting subsequent payment of Loss interest as calculated above through the date of such payment on the amount of Loss which the Company was not entitled to deny.

6.6 **Discharge of Obligation** — Payment by the Company of the amount of Loss required to be paid in accordance with this Policy will be a full and final discharge of its obligation with respect to such Loss under this Policy.

## 7   Additional Conditions

7.1 **Proceedings of Eminent Domain** — In the event that part or all of a Property is taken by eminent domain, or condemnation or by any other proceedings by federal, state or local governmental unit or agency, the Insured must require that the Borrower apply the maximum permissible amount of any compensation awarded in such proceedings to reduce the principal balance of the Loan, in accordance with the law of the jurisdiction where the Property is located.

7.2 **Pursuit of Deficiencies**

a.   The Insured will be entitled to pursue Appropriate Proceedings, or shall at the direction of the Company pursue Appropriate Proceedings through the end of the Settlement Period, which may result in the Borrower becoming liable for a deficiency after completion of the Insured's acquisition of a Property. Such pursuit may not be directed by the Company unless such deficiency is estimated to exceed $7,500. If the Company proposes to pursue a deficiency judgment, in whole or in part for its account, it will notify the Insured at least thirty (30) days before the foreclosure sale. If the Company does not so notify the Insured, the deficiency judgment, if established by the Insured, will be solely for the account of the Insured, and the Company will not be subrogated to any rights to pursue the deficiency judgment.

b.   The following provisions will apply if, in completing Appropriate Proceedings there are additional expenses advanced pursuant to Section 5.7 or additional interest accrued on the Loan, due to (1) an additional redemptive period or a delay in acquisition of Borrower's Title, which period or delay is directly related to establishing the deficiency judgment or (2) legal proceedings which are necessary to establish and pursue the deficiency judgment and which would not otherwise be the custom and practice used.

   i.   If the deficiency judgment is to be established, in whole or in part, for the account of the Company, the Company must pay the Insured at the time of payment of the Claim, regardless of which settlement option the Company has selected, the full amount of:

       (A)  such additional expenses advanced pursuant to Section 5.7 by the Insured; and

       (B)  such additional interest accrued on the unpaid principal balance of the Loan at the contract rate stated in the Loan, but excluding applicable late charges, penalty interest, or other changes to the interest rate by reason of Default.

   ii.  If the deficiency judgment is not to be established, in whole or in part, for the account of the Company, none of the additional interest or expenses of the type described in subparagraph (i) above will be includable in the Claim Amount or payable at any time by the Company.

   iii. For purposes of determining the additional expenses described in subparagraph (i) above resulting from pursuing the deficiency judgment, the limitation on attorneys' fees in Section 6.2 will not apply.

Page 17

Case 3:10-cv-00233-JSW    Document 60    Filed 09/09/11    Page 30 of 56
EX-99.1                                                                      Page 27 of 29
Case3:10-cv-00233-JSW  Document25-1   Filed02/25/10  Page28 of 30

    iv.  All of the additional interest, expenses, attorney's fees and court expenses described in subparagraph (i) above will be accrued or advanced only through acquisition of Borrower's Title, including any additional redemptive period.

    c.  The Company and the Insured may agree generally or with respect to a Loan to different terms and conditions than set forth in this Section 7.2. The Company and the Insured also may agree to the joint pursuit or other arrangements for the collection of deficiency judgments on mutually acceptable terms and conditions.

7.3 **Subrogation** — Subject to Section 7.2(a), and only to the extent that the Company is entitled under applicable law to pursue such deficiency rights, the Company will be subrogated, upon payment of the Loss, in the amount thereof and with an equal priority to all of the Insured's rights of recovery against a Borrower and any other Person relating to the Loan or to the Property. The Insured must execute and deliver at the request of the Company such instruments and papers and undertake such actions as may be necessary to transfer, assign and secure such rights. The Insured shall refrain from any action, either before or after payment of a Loss, that prejudices such rights.

7.4 **Policy for Exclusive Benefit of the Insured and the Owner** — A Commitment and Certificate issued as the result of any Application submitted hereunder and the coverage provided under this Policy will be for the sole and exclusive benefit of the Insured and the Owner of the related Loan, and in no event will any Borrower or other Person be deemed a party to, or an intended beneficiary of, this Policy or any Commitment or Certificate.

7.5 **Effect of Borrower Insolvency or Bankruptcy on Principal Balance** — If under applicable insolvency or bankruptcy law, a Loan's principal balance secured by a Property is reduced (after all appeals of such reduction are final or the time for such appeals has lapsed without appeal), the portion of such principal balance of the Loan not secured by the Property, and related interest, will be includable in the Claim Amount, as provided in this Section 7:5.

If a Default occurs on the Loan, the Insured has acquired Borrower's Title or Good and Merchantable Title to the Property as required by this Policy, and all other requirements for filing of a Claim are complied with, the Insured will be entitled to include in the Claim Amount (a) the amount of the principal balance of the Loan which was deemed unsecured under applicable insolvency or bankruptcy law, less any collections or payments on such unsecured principal balance received by the Insured, and (b) interest thereon at the rate and as computed in Section 6.2, from the date of Default giving rise to the Claim (but for no prior period). In no event will any expenses or other amounts associated with the amount by which the principal balance of the Loan became unsecured be includable in the Claim Amount, directly or by an addition to the principal balance includable in the Claim Amount.

7.6 **Arbitration of Disputes; Suits and Actions Brought by the Insured**

    a.  Unless prohibited by applicable law, all controversies, disputes or other assertions of liability or rights arising out of or relating to this Policy, including the breach, interpretation or construction thereof, shall be settled by arbitration. Notwithstanding the foregoing, the Company or the Insured both retain the right to seek a declaratory judgement from a court of competent jurisdiction on matters of interpretation of the Policy. Such arbitration shall be conducted in accordance with the Title Insurance Arbitration Rules of the American Arbitration Association in effect on the date the demand for arbitration is made, or if such Rules are not then in effect, such other Rules of the American Arbitration Association as the Company may designate as its replacement.

The arbitrator(s) shall be neutral person(s) selected from the American Arbitration Association's National Panel of Arbitrators familiar with the mortgage lending or mortgage guaranty insurance business. Any proposed arbitrator may be disqualified during the selection process, at the option of either party, if they are, or during the previous two (2) years have been, an employee, officer or director of any mortgage guaranty insurer, or of any entity engaged in the origination, purchase, sale or servicing of mortgage

loans or mortgage-backed securities.

b. No suit or action (including arbitration hereunder) brought by the Insured against the Company with respect to the Company's liability for a Claim under this Policy shall be sustained in any court of law or equity or by arbitration unless the Insured has substantially complied with the terms and conditions of this Policy, and unless the suit or action is commenced within three (3) years (five (5) years in Florida or Kansas) after the Insured has acquired Borrower's Title to the Property or sale of the Property approved by the Company is completed, whichever is applicable to a Loan. No such suit or action with respect to a Claim may be brought by the Insured against the Company until sixty (60) days after such acquisition of Borrower's Title or sale, as applicable to a Loan.

c. If a dispute arises concerning the Loan which involves either the Property or the Insured, the Company has the right to protect its interest by defending the suit, even if the allegations contained in such suit are groundless, false or fraudulent. The Company is not required to defend any lawsuit involving the Insured, the Property or the Loan.

7.7 **Release of Borrower; Defenses of Borrower** — The Insured's execution of a release or waiver of the right to collect any portion of the unpaid principal balance of a Loan or other amounts due under the Loan will release the Company from its obligation under its Certificate to the extent and amount of said release. If, under applicable law, the Borrower successfully asserts defenses which have the effect of releasing, in whole or in part, the Borrower's obligation to repay the Loan, or if for any other reason the Borrower is released from such obligation, the Company will be released to the same extent and amount from its liability under this Policy, except as provided by Section 7.5.

7.8 **Amendments; No Waiver; Rights and Remedies; Use of Term "Including"**

a. The Company reserves the right to amend the terms and conditions of this Policy from time to time; provided, however, that any such amendment will be effective only after the Company has given the Insured written notice thereof by endorsement setting forth the amendment. Such amendment will only be applicable to those Certificates where the related Commitment was issued on or after the effective date of the amendment.

b. No condition or requirement of this Policy will be deemed waived, modified or otherwise compromised unless that waiver, modification or compromise is stated in a writing properly executed on behalf of the Company. Each of the conditions and requirements of this Policy is severable, and a waiver, modification or compromise of one will not be construed as a waiver, modification or compromise of any other.

c. No right or remedy of the Company provided for by this Policy will be exclusive of, or limit, any other rights or remedies set forth in this Policy or otherwise available to the Company at law or equity.

d. As used in this Policy, the term "include" or "including" will mean "include or including, without limitation."

7.9 **No Agency** — Neither the Insured, any Servicer or Owner, nor any of their employees or agents, will be deemed for any reason to be agents of the Company. Neither the Company, nor any of its employees or agents, will be deemed for any reason to be agents of any Insured, Servicer or Owner.

7.10 **Successors and Assigns** — This Policy will inure to the benefit of and shall be binding upon the Company and the Insured and their respective successors and permitted assigns.

7.11 **Applicable Law and Conformity to Law** — All matters under this Policy will be governed by and construed in accordance with the laws of the jurisdiction in which the office of the original Insured on a Certificate is located. Any provision of this Policy which is in conflict with any provision of the law of such jurisdiction is hereby amended to conform to the provisions required by that law.

Page 19

Case 3:10-cv-00233-JSW    Document 60    Filed 09/09/11    Page 32 of 56
EX-99.1                                                                            Page 29 of 29
Case3:10-cv-00233-JSW    Document25-1    Filed02/25/10    Page30 of 30

7.12 **Notice** — All claims, premium payments, tenders, reports, other data and any other notices required to be submitted to the Company by the Insured must be sent to the Company at MGIC Plaza, 250 East Kilbourn Avenue, Milwaukee, WI 53202. The Company may change this address by giving written notice to the Insured. Unless the Insured otherwise notifies the Company in writing, all notices to the Insured must be sent to the address on the face of this Policy or, if the Insured is not located at such address, to the last known address of the Insured.

All notices under this Policy, whether or not identified in this Policy as required to be in writing, will be effective only if in writing and only upon receipt thereof. Written notices may instead be given in the form of telecopy or, if acceptable to the Company (for notices given to the Company) or to the Insured (for notices given to the Insured) in the form of computer tape or computer-generated or any other electronic message. A telecopy or such tape or message shall be effective only when received. The Company and the Insured may mutually agree that notices will be sent to any additional Person. Except as expressly agreed to by the Company and the Insured, no liability shall be incurred by the Company for the failure to give a notice to a Person other than the Insured.

7.13 **Reports and Examinations** — The Company may request, and the Insured must provide, such files, reports or information as the Company may deem necessary pertaining to any Loan, and the Company will be entitled to inspect the files, books and records of the Insured or any of its representatives pertaining to such Loan.

7.14 **Electronic Media** — The Company and the Insured may, from time to time, deliver or transfer information, documents or other data between them by electronic media acceptable to them. In addition, the Company and the Insured may maintain information, documents or other data on electronic media or other media generally accepted for business records, including microfiche. Such electronic or other media will be as equally acceptable for all purposes between the Insured and the Company as information, documents or other data maintained in printed or written form.

Page 20

# EXHIBIT B

## AMERICAN ARBITRATION ASSOCIATION

MORTGAGE GUARANTY INSURANCE
CORPORATION,

Claimant,

v.

COUNTRYWIDE HOME LOANS, INC., and BAC HOME
LOANS SERVICING, LP (formerly Countrywide Home
Loans Servicing, LP),

Respondents.

## MORTGAGE GUARANTY INSURANCE CORPORATION'S DEMAND FOR ARBITRATION

Pursuant to the arbitration clause in the Mortgage Guaranty Master Policy between the

parties, Mortgage Guaranty Insurance Corporation (MGIC) asserts this Demand for arbitration

against Countrywide Home Loans and its affiliate BAC Home Loans Servicing (collectively,

Countrywide).

1.    Countrywide is a mortgage lender.  MGIC insures mortgage lenders against

borrower defaults.  This Demand concerns MGIC's contractual right to rescind or otherwise

deny insurance coverage, including its right to rescind or deny approximately 1,400 Countrywide

claims under the parties' Mortgage Guaranty Master Policy, also called "the Flow Policy"

(attached as Exhibit A).[1]

### Nature of the Dispute

2.    By 2005, Countrywide had become the largest mortgage lender in the United

States, originating nearly half-a-trillion dollars annually in mortgage loans.  Countrywide had

---

[1] MGIC entered into separate Mortgage Guaranty Master Policies with many Countrywide branch
locations.  As a result, there are hundreds of separate Mortgage Guaranty Master Policies between the
parties.  Because, with the exception of certain state-specific endorsements, these Mortgage Guaranty
Master Policies are identical, MGIC collectively refers to the policies as the "Flow Policy."

historically sold a substantial proportion of its loan portfolio on the secondary market to Government Sponsored Entities (GSEs) such as Fannie Mae and Freddie Mac. GSEs generally only purchase relatively low-risk loans. Accordingly, for many years most of Countrywide's loans had been such relatively low-risk loans. Countrywide regularly assured the public that its proprietary and exacting underwriting criteria were consistently generating high-quality mortgages.

3.     Countrywide's assurances about the quality of its underwriting were false. In a relentless drive to increase revenues and market share during the housing boom, Countrywide embarked on a reckless strategy to attract new, subprime and other high-risk business. Contrary to its public representations, Countrywide grossly relaxed its underwriting guidelines to the point that Countrywide itself internally labeled them "among the most aggressive in the industry." And Countrywide failed to abide by even its own relaxed guidelines. Countrywide and its agents engaged in widespread reckless underwriting, often deliberately ignoring, concealing, or misrepresenting borrower credit-risk characteristics. In many cases, Countrywide and its agents knowingly participated in or facilitated borrower fraud.

4.     In about 2005, Countrywide implemented a so-called "supermarket" or "matching strategy" that committed the company to offer *any borrower* a loan on *any terms* provided by at least one competitor. For example, to match the subprime competition, Countrywide lent to borrowers with poor credit histories and originated an enormous volume of loans with higher (and therefore riskier) debt-to-income (DTI) and loan-to-value (LTV) ratios than it had in the past. Countrywide began making a large number of "stated-income" loans – for which Countrywide did not verify the borrower's reported income by looking at pay stubs, W-2 forms, income tax returns or any other records. Instead, Countrywide simply took stated-income borrowers at their word. Under the supermarket strategy, Countrywide won the race to the bottom, underwriting the riskiest loans by every relevant measure of borrower risk.

5.     In about 2005, Countrywide also adopted a "no-brokering" policy that forbade Countrywide loan officers from referring mortgage applicants to other mortgage lenders.

Previously, Countrywide loan officers could broker a loan to a competitor in exchange for a commission. The purpose and effect of Countrywide's switch to a no-brokering policy, when combined with the change in underwriting standards, was to encourage Countrywide loan officers to systematically ignore risk in order to attract and retain business.

6.      Countrywide's reckless underwriting and market-share-at-any-cost strategy led it to knowingly or negligently originate thousands of loans tainted by flagrant borrower, broker, appraiser and other fraud. For example, by about 2006 Countrywide's internal risk assessors knew that in a substantial number of its stated-income loans – fully a third – borrowers overstated income by more than 50%. Countrywide also knew that many appraisers were overstating property values to drive originations by making loans appear less risky. Countrywide knew it was underwriting many loans that materially understated DTI and LTV ratios. Countrywide deliberately disregarded these and other signs of fraud in order to increase its market share.

7.      As a result of its reckless underwriting practices, starting in about 2006 Countrywide's loan portfolio rapidly deteriorated, and defaults and foreclosures on its loans soared. The company failed to survive on its own. In 2008, Countrywide avoided insolvency by agreeing to be acquired by Bank of America.

8.      During the housing boom, Countrywide significantly increased the volume of loans it submitted to MGIC for insurance coverage. MGIC has provided private mortgage insurance for over 50 years. Mortgage insurance covers certain losses from borrower defaults on residential mortgage loans. By enabling lenders to spread default risk, mortgage insurance frees up lender capital and facilitates a less volatile residential lending market.

9.      MGIC agreed to provide mortgage insurance for certain Countrywide loans under the terms of the Flow Policy. As discussed below, under certain circumstances the Flow Policy permits MGIC to rescind or deny insurance of ineligible loans, loans involving material misrepresentations, or loans tainted by fraud in origination.

10.     As Countrywide's loan defaults soared in recent years, so have its claims for

3

insurance to MGIC. Because of Countrywide's reckless underwriting, a substantial proportion of its insurance applications are ineligible for coverage and contained materially false and grossly misleading statements or omissions about significant risks of borrower default. MGIC has therefore denied or rescinded coverage of a higher percentage of Countrywide loans as compared to other lenders. Countrywide has disputed all or virtually all of MGIC's claim denials and rescissions.

11.    Now that the misrepresented and undisclosed risks of Countrywide's reckless practices have materialized, Countrywide seeks to shift the substantial losses caused by its recklessness to MGIC. But the Flow Policy the parties agreed to does not hold MGIC liable for Countrywide's irresponsible and fraudulent business practices. In accordance with the Policy, MGIC is entitled to rescind or otherwise deny coverage of the disputed claims.

### The Parties

12.    Claimant MGIC is a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin.

13.    Respondent Countrywide Home Loans, Inc. is a New York corporation with its principal place of business in Calabasas, California. Respondent BAC Home Loans Servicing, LP (formerly Countrywide Homes Loan Servicing, LP) is a limited partnership organized under the laws of Texas with its principal place of business in Plano, Texas.

### The Arbitration Clause

14.    This Demand is governed by the Flow Policy's arbitration clause, which states:

Unless prohibited by applicable law, all controversies, disputes or other assertions of liability or rights arising out of or relating to this Policy, including the breach, interpretation or construction thereof, shall be settled by arbitration. Notwithstanding the foregoing, [MGIC] or [Countrywide] both retain the right to seek a declaratory judgment from a court of competent jurisdiction on matters of interpretation of the Policy. Such arbitration shall be conducted in accordance with the Title Insurance Arbitration Rules of the American Arbitration Association in effect on the date the demand for arbitration is made, or if such Rules are not then in effect, such other Rules of the American Arbitration Association as [MGIC] may designate as its replacement.

Ex. A. § 7.6(a).

4

15.    The arbitration clause further provides:

The arbitrator(s) shall be neutral person(s) selected from the American Arbitration Association's National Panel of Arbitrators familiar with the mortgage lending or mortgage guaranty insurance business. Any proposed arbitrator may be disqualified during the selection process, at the option of either party, if they are, or during the previous two (2) years have been, an employee, officer or director of any mortgage guaranty insurer, or of any entity engaged in the origination, purchase, sale or servicing of mortgage loans or mortgage-backed securities.

*Id.*.

16.    MGIC's contested right to rescind or otherwise deny insurance coverage of the Countrywide claims that are the subject of this Demand presents a dispute "arising out of or relating to" the Flow Policy. Because the American Arbitration Association's Title Insurance Arbitration Rules are not in effect, MGIC designates the American Arbitration Association's Commercial Arbitration Rules. Arbitration of this dispute is therefore proper by one or more neutral arbitrators from the American Arbitration Association's National Panel of Arbitrators familiar with the mortgage lending or mortgage guaranty insurance market.

## The MGIC-Countrywide Flow Policy

17.    Countrywide sought mortgage insurance from MGIC to cover a substantial percentage of the individual loans Countrywide made. Countrywide and MGIC entered into the Flow Policy, which governed the individual Countrywide loans at issue in this Demand. Under the Flow Policy, Countrywide submitted to MGIC an application for insurance describing each particular loan Countrywide wanted to insure. If, based on facts regarding the loan submitted by Countrywide, the loan appeared to meet agreed upon "eligibility criteria," MGIC would issue a certificate of insurance for the loan. Eligibility criteria, which included, among other things, "maximum loan-to-value ratios and original principal amounts, coverage limitations, underwriting requirements and payment status," exist to screen loans that MGIC is unwilling to insure due to their elevated risk characteristics. Ex. A. § 1.27.

18.    Countrywide submitted multiple loan programs to MGIC with proposed eligibility criteria for various types of loans. After negotiations between the parties regarding the eligibility

5

criteria, MGIC approved certain Countrywide loan programs (often with agreed-upon modifications) and corresponding eligibility criteria. MGIC thereby established the eligibility criteria for Countrywide loans.

*Loan Misrepresentation Provisions*

19.     Given the way in which home mortgage loans are made, Countrywide knew MGIC would have no contact with Countrywide's borrowers, the properties that served as collateral for their loans, or the loan officers who originated the loans, and MGIC did not. As Countrywide knew would be the case, MGIC had to rely on Countrywide to collect and relay accurate, complete, and truthful information in each application for mortgage insurance, and to reasonably underwrite each loan, and MGIC did. MGIC also relied on Countrywide to monitor its employees and broker network to ensure the integrity of the information being collected and relayed to MGIC. Through the Flow Policy, Countrywide represented that all of the statements contained in an application for insurance, "whether by it, the Borrower, or any other Person, have been made and presented for and on behalf of" Countrywide, and were true and complete in all material respects. *Id.* §§ 2.2(a), (b).

20.     If Countrywide submitted an application for insurance that contained materially false or misleading information, the Flow Policy allowed MGIC "to cancel or rescind coverage" "retroactively to commencement of coverage." *Id.* § 2.3. MGIC agreed not to contest coverage due to certain misrepresentations (excluding misrepresentations associated with appraisals) if Countrywide or its agents could satisfy the condition that they did not knowingly make or knowingly participate in the misrepresentation. *Id.* § 2.4.

21.     The Flow Policy excluded from coverage any claim where Countrywide's negligence was material to the acceptance of the risk, materially contributed to the loan default, or increased the loss. *Id.* § 4.4(b).

*Loan Eligibility Criteria Provisions*

22.     Under the Flow Policy, Countrywide represented that each loan for which it applied for insurance complied "with the Eligibility Criteria in effect at the time the Application"

6

was submitted to MGIC. *Id.* § 2.2(c).

23. Loans that did not meet MGIC's eligibility criteria were excluded from coverage under the Flow Policy: "This Policy will not apply to, extend to or cover" "[a]ny Loan that did not meet the Eligibility Criteria in effect at the time the related Application was submitted to [MGIC.]" *Id.* §4.11.

## Countrywide's Submission of Thousands of Claims for Fraudulent and Ineligible Loans

24. Due to its reckless underwriting and its facilitation of rampant borrower, broker, appraiser and other fraud, Countrywide loans defaulted at a disproportionately higher rate than those of other mortgage lenders. In recent years, Countrywide loans have defaulted at more than 150% the rate associated with other lenders MGIC insured. MGIC's claims investigations have revealed that Countrywide submitted thousands of applications for insurance that were ineligible for coverage or were riddled with materially false information.

25. Based on the evidence it obtained during its investigations, MGIC has exercised its right to rescind or deny coverage of approximately 1,400 Countrywide claims at issue to date in this Demand. The Countrywide claims that MGIC currently believes to be in dispute are listed in Exhibit B.

## Countrywide's Lawsuit

26. On December 17, 2009, Countrywide filed a lawsuit in California Superior Court contesting MGIC's right to rescind or otherwise deny coverage of disputed claims, and purportedly seeking a declaratory judgment. On January 19, 2010, MGIC removed the action to the United States District Court for the Northern District of California under 28 U.S.C. § 1441, and Countrywide has moved to remand the case to state court. On February 25, 2010, MGIC will respond to Countrywide's complaint by filing a motion to stay the lawsuit pending arbitration.

## Representative Claims in Dispute

*MGIC Certificate No. 23755967* [2]

27.     MGIC incorporates by reference paragraphs 1 through 26.

28.     This claim arises out of Maria Banuelos's purchase of a $600,000 home in San Jose, California. According to the borrower's application provided by Countrywide to MGIC, Ms. Banuelos worked as an account executive for GNG Investments in Santa Clara, California, and earned $13,494.03 per month. The Countrywide insurance application file reported that Ms. Banuelos put 5% ($30,000) down and that Countrywide, acting through loan officer Ernesto Martinez, provided a $570,000 mortgage loan to Ms. Banuelos. Countrywide's file also reported that Ms. Banuelos intended to use the home as her primary residence, and that she owned a $45,000 liquid bank account at Wells Fargo. Based on her reported salary and the monthly debt service, Ms. Banuelos's loan carried a DTI ratio of 37.91%. Based on the representations in Countrywide's insurance application, MGIC agreed to insure the loan under the Flow Policy and issued Countrywide a certificate of insurance.

29.     Ms. Banuelos defaulted on her Countrywide mortgage loan and Countrywide submitted a claim to MGIC for insurance coverage.

30.     After receiving Countrywide's insurance claim, MGIC investigated the claim and uncovered the following facts. First, contrary to Countrywide's insurance application, Ms. Banuelos was never an account executive at GNG Investments. There is no such enterprise operating in Santa Clara or anywhere else in California. Nor did she earn $13,494 per month, as Countrywide represented. Instead, Ms. Banuelos earned $3,901.58 per month as a janitor for Santa Clara Valley Medical Center.

31.     MGIC also learned that, contrary to the representations in Countrywide's insurance application, Ms. Banuelos never had a bank account at Wells Fargo, let alone one worth $45,000. Nor did she put a $30,000 down payment—or a down payment of any amount—

---

[2] When MGIC insures a loan it issues a Certificate to the lender which contains a Certificate number assigned by MGIC to identify the loan in MGIC's records.

8

on her house. And instead of using the house as a primary residence, Ms. Banuelos intended to purchase the property as an investment.

32.     Ms. Banuelos reported that she disclosed her true employment, her actual income, her intention to use the property for investment purposes, and the state of her personal finances to the actual loan officer, Marta Gonzales. Ms. Banuelos has never met or heard of Ernesto Martinez, the loan officer identified on Countrywide's insurance application for this loan.

33.     Based on Ms. Banuelos's true income, her loan carried a DTI ratio of 134.05%, far in excess of the 37.91% reported to MGIC. Such a ratio implies that even if Ms. Banuelos devoted 100% of her pre-tax income to her mortgage payment she still could not meet her monthly debt service.

34.     A DTI ratio of 134.05% far exceeds the maximum DTI ratio established by MGIC's eligibility criteria, and this loan was therefore ineligible for MGIC insurance coverage. Countrywide's insurance application to MGIC contains numerous material misrepresentations about Ms. Banuelos's employment, income, personal finances, and intentions for the property. The loan officer who originated Ms. Banuelos's mortgage loan facilitated and knowingly participated in the misrepresentations. Countrywide knew of the misrepresentations or would have known of them had it not engaged in reckless, unreasonable underwriting practices.

35.     Pursuant to the Flow Policy, including §§ 2.2, 2.3, 2.4, 4.4 and 4.11, MGIC is entitled to deny or rescind coverage of this claim.

*MGIC Certificate No. 25639575*

36.     MGIC incorporates by reference paragraphs 1 through 26.

37.     This claim arises out of Izabela Pichnuita's purchase of a $360,000 home in Chicago, Illinois. According to the borrower's application provided by Countrywide to MGIC, Ms. Pichnuita was an employee at the Paulen Auto Body Shop and earned $6,833 per month. The Countrywide insurance application file reported that Countrywide, acting through loan officer Chris Bozek, provided a $339,000 mortgage loan to Ms. Pichnuita. Countrywide's file also reported that Ms. Pichnuita intended to use the home as her primary residence. Based on

9

her reported salary and the monthly debt service, Ms. Pichnuita's loan carried a DTI ratio of 39%. Based on the representations in Countrywide's insurance application, MGIC agreed to insure the loan under the Flow Policy and issued Countrywide a certificate of insurance.

38.     Ms. Pichnuita defaulted on her Countrywide mortgage loan and Countrywide submitted a claim to MGIC for insurance coverage.

39.     After receiving Countrywide's insurance claim, MGIC investigated the claim and uncovered the following facts. First, contrary to Countrywide's insurance application, Ms. Pichnuita was never employed by the Paulen Auto Body Shop. Nor did she earn $6,833 per month, as Countrywide represented. Ms. Pichnuita was a part-time housekeeper who earned $200 to $300 per week, or approximately $1,300 per month.

40.     MGIC also learned that, contrary to the representations in Countrywide's insurance application, Ms. Pichnuita did not purchase the property as her primary residence. Ms. Pichnuita posed as a front buyer to help her sister, Katarzyna Debowski, and brother-in-law, Bartlomeij Debowski, acquire the home. A few months after closing, Ms. Pichnuita returned to her home in Poland because she was unable to find steady work in Chicago.

41.     Ms. Pichnuita reported to MGIC that she disclosed her true employment, her actual income, and her intention to help her family purchase the property to the loan officer Mr. Bozek. Mr. Bozek told Ms. Pichnuita that she could pose as a front buyer, obtain mortgage financing for her sister and brother-in-law, and avoid personal responsibility for the loan. Mr. Bozek advised Ms. Pichnuita that she would need to produce proof of employment and income to complete the loan transaction. When Ms. Pichnuita informed Mr. Bozek that she was a friend of Greg Kaperski, the son of the owner of the Paulen Auto Body Shop, Mr. Bozek helped her prepare a document for Mr. Kaperski to sign that falsely stated her employment and monthly income. Mr. Kaperski signed Mr. Bozek's document under the fictitious name Greg Gordon.

42.     Ms. Pichnuita also reported that she was not present at closing, and Mr. Bozek permitted her brother-in-law Mr. Debowski to sign her name on the closing documents. She believes responsibility for the mortgage lies with Mr. and Mrs. Debowski and has never made a

10

mortgage payment.

43.     Based on Ms. Pichnuita's actual income, her loan carried a DTI ratio of 205.47%, far in excess of the 39% reported to MGIC.

44.     Countrywide's insurance application to MGIC contains numerous material misrepresentations about Ms. Pichnuita's employment, income, and intentions for the property. The loan officer who originated Ms. Pichnuita's mortgage loan facilitated and knowingly participated in the misrepresentations. Countrywide knew of the misrepresentations or would have known of them had it not engaged in reckless, unreasonable underwriting practices.

45.     Pursuant to the Flow Policy, including §§ 2.2, 2.3, 2.4, and 4.4, MGIC is entitled to deny or rescind coverage of this claim.

## MGIC Certificate No. 25797915

46.     MGIC incorporates by reference paragraphs 1 through 26.

47.     This claim arises out of Manuel Campos's purchase of a $350,000 home in Livingston, California. According to the borrower's application provided by Countrywide to MGIC, Mr. Campos worked as a dairy foreman at Jose Silveira Dairy and earned $10,500 per month. The Countrywide insurance application file reported that Countrywide, acting through loan officer Hasham Samaan, provided a $350,000 mortgage loan to Mr. Campos. Countrywide's file also reported that Mr. Campos intended to use the home as his primary residence. Based on his reported monthly income and debt service, Mr. Campos's loan carried a DTI ratio of 43.26%. Based on the representations in Countrywide's insurance application, MGIC agreed to insure the loan under the Flow Policy and issued a certificate of insurance.

48.     Mr. Campos defaulted on his Countrywide mortgage loan and Countrywide submitted a claim to MGIC for insurance coverage.

49.     After receiving Countrywide's insurance claim, MGIC investigated the claim and uncovered the following facts. First, contrary to Countrywide's insurance application, Mr. Campos was not a dairy foreman and did not earn $10,500 per month. Instead, Mr. Campos was employed as a milker for Jose Silveira Dairy and earned $1,100 per month.

11

50.    MGIC also learned that, contrary to the representations in Countrywide's insurance application, Mr. Campos did not intend to purchase the home as his primary residence. He instead intended to help his son acquire the property.

51.    Mr. Campos reported that he disclosed his true employment, his actual income, and his intention to help Saul purchase the property to loan officer Mr. Samaan. Mr. Samaan falsely informed Mr. Campos that Mr. Campos could help his son buy the home without bearing responsibility for the monthly mortgage payments. Mr. Samaan described the transaction to Mr. Campos as "lending your son your credit." Mr. Campos, who cannot read English, signed the closing documents where Mr. Samaan told him to. Mr. Samaan knew that Mr. Campos never intended to live at the property or to make any mortgage payments.

52.    Based on Mr. Campos's actual income, his loan carried a DTI ratio of 403.40%, nearly 10 times higher than the DTI ratio represented in Countrywide's insurance application.

53.    Countrywide's insurance application to MGIC contains numerous material misrepresentations about Mr. Campos's employment, income, and intentions for the property. The loan officer who originated Mr. Campos's mortgage loan facilitated and knowingly participated in the misrepresentations. Countrywide knew of the misrepresentations or would have known of them had it not engaged in reckless, unreasonable underwriting practices.

54.    Pursuant to the Flow Policy, including §§ 2.2, 2.3, 2.4, and 4.4, MGIC is entitled to deny or rescind coverage of this claim.

*MGIC Certificate No. 23789635*

55.    MGIC incorporates by reference paragraphs 1 through 26.

56.    This claim arises out of Maria Madrigal's refinancing of her home in Ceres, California. According to the borrower's application provided by Countrywide to MGIC, Ms. Madrigal worked as a sales executive for Bay Area Sales and Marketing, and earned $8,700 per month. The Countrywide insurance application file reported that Countrywide, acting through loan officer Nasira Mojaddeci, provided a $398,050 mortgage loan to Ms. Madrigal to refinance her home. Countrywide's file also reported that Ms. Madrigal intended to use the home as her

12

primary residence and did not have any other mortgages or loans in her name. Based on her reported salary and the monthly debt service, Ms. Madrigal's loan carried a DTI ratio of 35.17%. Based on the representations in Countrywide's insurance application, MGIC agreed to insure the loan under the Flow Policy and issued a certificate of insurance.

57.    Ms. Madrigal defaulted on her Countrywide mortgage loan and Countrywide submitted a claim to MGIC for insurance coverage.

58.    After receiving Countrywide's insurance claim, MGIC investigated the claim and uncovered the following facts. First, contrary to Countrywide's insurance application, Ms. Madrigal never worked as a sales executive for Bay Area Sales and Marketing. There is no such enterprise. Nor did she earn $8,700 per month, as Countrywide represented. Instead, Ms. Madrigal had been unemployed since 1989. Her husband, who was not named on the Countrywide mortgage loan, was the sole provider in Ms. Madrigal's household.

59.    MGIC also learned that, contrary to the representations in Countrywide's insurance application, Ms. Madrigal did not intend to use the home as her primary residence. She instead intended to rent the property to her daughter. In addition, Ms. Madrigal had two undisclosed mortgages on a property that was not mentioned in Countrywide's insurance application. These undisclosed mortgage loans raised Ms. Madrigal's monthly debt-service obligations from $2,300 to $5,811.56.

60.    Ms. Madrigal reported that she disclosed her unemployment status, her lack of income, and her intention to rent the property to Ms. Mojaddeci.

61.    Without any income of her own, Ms. Madrigal's DTI ratio was infinitely high.

62.    Because she had no income, Ms. Madrigal's DTI ratio exceeded the maximum DTI ratio established by MGIC's eligibility criteria, and this loan was therefore ineligible for MGIC insurance coverage. Countrywide's insurance application to MGIC contains numerous material misrepresentations about Ms. Madrigal's employment, income, and intentions for the property. The loan officer who originated Ms. Madrigal's mortgage loan facilitated and knowingly participated in the misrepresentations. Countrywide knew of the misrepresentations

13

or would have known of them had it not engaged in reckless, unreasonable underwriting practices.

63.    Pursuant to the Flow Policy, including §§ 2.2, 2.3, 2.4, 4.4 and 4.11, MGIC is entitled to deny or rescind coverage of this claim.

### MGIC Certificate No. 25616578

64.    MGIC incorporates by reference paragraphs 1 through 26.

65.    This claim arises out of Derrick Williams's purchase of a $395,000 home in Atlanta, Georgia. The Countrywide insurance application file reported that Mr. Williams put 10% ($39,500) down and that Countrywide provided a $355,500 mortgage loan to him. Countrywide's file also reported that, as of August 28, 2007, the appraised value of the property was $395,500. Based on the appraised value and a 10% down payment, Mr. Williams's loan carried a LTV ratio of 90%. Based on the representations in Countrywide's insurance application, MGIC agreed to insure the loan under the Flow Policy and issued a certificate of insurance.

66.    Mr. Williams defaulted on his Countrywide loan and Countrywide submitted a claim to MGIC for insurance coverage.

67.    After receiving Countrywide's insurance claim, MGIC investigated the claim and uncovered the following facts. Contrary to Countrywide's insurance application, Mr. Williams's home was not worth $395,500 as of August 28, 2007. Mr. Williams's home had sold three times in the year prior to the effective date of Countrywide's appraisal: on October 3, 2006 for $199,750; on February 6, 2007, for $127,500; and on March 23, 2007, five months before the represented appraisal, for $200,000. Countrywide's appraisal did not note any significant improvements to the property, and there is no reasonable basis for the five-month, 98% appreciation implied by Countrywide's $395,000 appraisal. A retroactive appraisal based on comparable sales in the vicinity of Mr. Williams's property showed that the fair market value of the real estate as of August 28, 2007, was $277,000.

68.    Based on the 10% down payment and the $277,000 fair value of Mr. Williams's

14

property, his loan carried an LTV ratio of 128.34%, or 42.60% higher than represented in Countrywide's application for mortgage insurance.

69.    Countrywide's application for insurance, including its appraisal, materially misrepresents the true value of Mr. Williams's property.

70.    Pursuant to the Flow Policy, including §§ 2.2, 2.3, 2.4, and 4.4, MGIC is entitled to deny or rescind coverage of this claim.

## MGIC Certificate No. 24475116

71.    MGIC incorporates by reference paragraphs 1 through 26.

72.    This claim arises out of Hasibullah Aqai's purchase of a $187,400 condo in Decatur, Illinois. According to the borrower's application provided by Countrywide to MGIC, Mr. Aqai earned $3,400 per month. The Countrywide insurance application file reported that Countrywide, acting through loan officer Kirlaki Troulos, provided a $187,400 mortgage loan to Mr. Aqai. Countrywide's file also reported that Mr. Aqai intended to purchase the property as his primary residence and did not have any other mortgage loans. Countrywide's file further reported that, as of December 13, 2006, the appraised value of the property was $187,400. Based on the appraised value of the condo and Mr. Aqai's reported salary and monthly debt service, his loan carried an LTV ratio of 100% and a DTI ratio of 65.94%. Based on the representations in Countrywide's insurance application, MGIC agreed to insure the loan under the Flow Policy and issued a certificate of insurance.

73.    Mr. Aqai defaulted on his Countrywide mortgage loan and Countrywide submitted a claim to MGIC for insurance coverage.

74.    After receiving Countrywide's insurance claim, MGIC investigated the claim and uncovered the following facts. First, contrary to Countrywide's insurance application, Mr. Aqai did not intend to occupy the condo as his primary residence. Instead, he was a front buyer for an investment firm called The One Group. Under an arrangement he had with the group's principals, Mr. Aqai purchased real estate in the Chicago area that The One Group converted into rental properties.

15

75.     MGIC also learned that, contrary to the representations in Countrywide's insurance application, Mr. Aqai had multiple undisclosed mortgages on properties he purchased for The One Group. These undisclosed mortgages raised his total monthly debt payments from $2,240.99 to $8,892.28.

76.     Contrary to Countrywide's insurance application, Mr. Aqai's condo was not worth $187,400 as of December 13, 2006. A retroactive appraisal based on comparable sales in the vicinity of Mr. Aqai's property showed that the fair market value of the condo as of December 13, 2006, was $155,000.

77.     Mr. Aqai reported that he disclosed his multiple mortgages and his intention not to reside in the condo to the loan officer Mr. Troulos. Mr. Troulos himself worked for the principals of The One Group and knowingly facilitated their fraud by forging Mr. Aqai's signature on loan and closing documents.

78.     Based on the actual value of the condo, Mr. Aqai's mortgage loan, his undisclosed monthly loan obligations, and his total monthly income, Mr. Aqai's loan carried an LTV ratio of 120.90% and a DTI ratio of 261.57%.

79.     Countrywide's application for insurance, including its appraisal, materially misrepresents the true value of Mr. Aqai's property. Countrywide's insurance application also contains numerous material misrepresentations about Mr. Aqai's monthly debt obligations and intentions for the property. The loan officer who originated Mr. Aqai's mortgage loan facilitated and knowingly participated in the misrepresentations. Countrywide knew of the misrepresentations or would have known of them had it not engaged in reckless, unreasonable underwriting practices.

80.     Pursuant to the Flow Policy, including §§ 2.2, 2.3, 2.4, and 4.4, MGIC is entitled to deny or rescind coverage of this claim.

*MGIC Certificate No. 23576240*

81.     MGIC incorporates by reference paragraphs 1 through 26.

82.     This claim arises out of Todd Davidson's purchase of a $565,000 home in San

16

Bernardino, California. According to the borrower's application provided by Countrywide to MGIC, Mr. Davidson owned a production company, and, according to tax returns submitted with the application, earned $17,661 per month. The Countrywide insurance application file reported that Mr. Davidson put 12% ($70,000) down, as evidenced by a Bank of America cashier's check, and that Countrywide provided a $495,000 mortgage loan to him. Countrywide's file also reported that Mr. Davidson owned a $79,458 liquid bank account at Washington Mutual. Based on his reported salary and the monthly debt service, Mr. Davidson's loan carried a DTI ratio of 16.55%. Based on the representations in Countrywide's insurance application, MGIC agreed to insure the loan under the Flow Policy and issued Countrywide a certificate of insurance.

83.    Mr. Davidson defaulted on his Countrywide mortgage loan and Countrywide submitted a claim to MGIC for insurance coverage.

84.    After receiving Countrywide's insurance claim, MGIC investigated the claim and uncovered the following facts. First, contrary to Countrywide's insurance application, there is no evidence that Mr. Davidson owned a production company. Nor did he earn $17,661 per month, as Countrywide represented. The tax returns Countrywide submitted in its application were fraudulent. Mr. Davidson has no verified income.

85.    MGIC also learned that, contrary to the representations in Countrywide's insurance application, Mr. Davidson does not have a bank account at Washington Mutual, let alone one worth $79,458. Nor did he put a $70,000 down payment—or a down payment of any amount—on his house.

86.    Because Mr. Davidson has no verified income, his loan carried a DTI ratio of infinity.

87.    Mr. Davidson's true DTI ratio failed to meet MGIC's eligibility criteria, and this loan was therefore ineligible for MGIC insurance coverage. Countrywide's insurance application to MGIC contains numerous material misrepresentations about Mr. Davidson's employment, income, and personal finances. Countrywide knew of the misrepresentations or would have known of them if it had not engaged in reckless, unreasonable underwriting

17

practices.

88. Pursuant to the Flow Policy, including §§ 2.2, 2.3, 2.4, 4.4 and 4.11, MGIC is entitled to deny or rescind coverage of this claim.

### MGIC Certificate No. 25610693

89. MGIC incorporates by reference paragraphs 1 through 26.

90. This claim arises out of Gino Hickey's purchase of a $205,000 home in Rancho Cucamo, California. According to the borrower's application provided by Countrywide to MGIC, Mr. Hickey was a field supervisor for Care Net Management Services, and earned $6,150 per month. The Countrywide insurance application file reported that Countrywide, acting through loan officer Jesse Spinner, provided a $205,000 mortgage loan to Mr. Hickey. Countrywide's file also reported that Mr. Hickey intended to use the home as his primary residence and had no other monthly loan obligations. Based on his reported salary and the monthly debt service, Mr. Hickey's loan carried a DTI ratio of 33.13%. Based on the representations in Countrywide's insurance application, MGIC agreed to insure the loan under the Flow Policy and issued Countrywide a certificate of insurance.

91. Mr. Hickey defaulted on his Countrywide mortgage loan and Countrywide submitted a claim to MGIC for insurance coverage.

92. After receiving Countrywide's insurance claim, MGIC investigated the claim and uncovered the following facts. First, contrary to Countrywide's insurance application, Mr. Hickey was never a field supervisor at Care Net Management Services. Nor did he earn $6,150 per month, as Countrywide represented. Instead, Mr. Hickey was employed at Legg Construction at the time of the application, and earned $4,160.83 per month.

93. MGIC also learned that, contrary to the representations in Countrywide's insurance application, Mr. Hickey had other debts that raised his monthly debt payments from $2,037.66 to $3,618.66. And Mr. Hickey did not intend to occupy the home as his primary residence. Instead, he was a front buyer who purchased the home for the loan officer, Jesse Spinner, who planned to rent out the property.

18

94.     Mr. Hickey reported that he disclosed his true employment, his actual income, his actual monthly debts, and his intention to use the property for investment purposes to Mr. Spinner. Mr. Spinner falsely assured Mr. Hickey that posing as a front buyer was a legal means of building Mr. Hickey's credit.

95.     Based on Mr. Hickey's actual income and his undisclosed monthly debts, his loan carried a DTI ratio of 86.97%, far in excess of the 34.13% reported to MGIC.

96.     Countrywide's insurance application to MGIC contains numerous material misrepresentations about Mr. Hickey's employment, income, personal finances, and intentions for the property. The loan officer who originated Mr. Hickey's mortgage loan facilitated and knowingly participated in the misrepresentations. Countrywide knew of the misrepresentations or would have known of them had it not engaged in reckless, unreasonable underwriting practices.

97.     Pursuant to the Flow Policy, including §§ 2.2, 2.3, 2.4, and 4.4, MGIC is entitled to deny or rescind coverage of this claim.

### MGIC Certificate No. 24487467

98.     MGIC incorporates by reference paragraphs 1 through 26.

99.     This claim arises out of Leann Schumacher's purchase of a $115,000 home in Milwaukee, Wisconsin. According to the borrower's application provided by Countrywide to MGIC, Ms. Schumacher was a State Farm Agent, and earned $4,562 per month. The Countrywide insurance application file reported that Ms. Schumacher put 5% ($5,750) down and that Countrywide, acting through a loan officer at Mortgage Solutions of Wauwatosa, provided a $109,250 mortgage loan to her. Countrywide's file also reported that Ms. Schumacher owned a liquid bank account at TCF Bank worth $21,631.40. Countrywide's file further reported that, as of December 19, 2006, the appraised value of the property was $115,000. Based on the appraised value of the home and Ms. Schumacher's down payment, reported salary and monthly debt service, her loan carried an LTV ratio of 95% and a DTI ratio of 38.98%. Based on the representations in Countrywide's insurance application, MGIC agreed to insure the loan under

19

the Flow Policy and issued a certificate of insurance.

100. Ms. Schumacher defaulted on her Countrywide mortgage loan and Countrywide submitted a claim to MGIC for insurance coverage.

101. After receiving Countrywide's insurance claim, MGIC investigated the claim and uncovered the following facts. First, contrary to Countrywide's insurance application, Ms. Schumacher was an account representative, not an agent, of a State Farm agency. She did not earn $4,562 per month, as Countrywide represented. Instead, Ms. Schumacher earned $1,695.08 per month.

102. MGIC also learned that, contrary to the representations in Countrywide's insurance application, Ms. Schumacher did not own a $21,631.40 TCF Bank account. Nor did she put a $5,750 down payment—or a down payment of any amount—on her house.

103. Contrary to Countrywide's insurance application, Ms. Schumacher's house was not worth $115,000 as of December 19, 2006. A retroactive appraisal based on comparable sales in the vicinity of Ms. Schumacher's property showed the fair market value for the condo as of December 19, 2006, was $100,000.

104. Ms. Schumacher reported that she disclosed her true income and the true state of her personal finances to her loan officer.

105. Based on the fair value of the home and Ms. Schumacher's true income, her loan carried an LTV ratio of 109.2% and a DTI ratio of 115.17%.

106. An LTV ratio of 109.20% and a DTI ratio of 115.17% far exceed the maximum LTV and DTI ratios established by MGIC's eligibility criteria, and this loan was therefore ineligible for MGIC insurance coverage. Countrywide's application for insurance, including its appraisal, materially misrepresents the true value of Ms. Schumacher's property. Countrywide's insurance application also contains numerous material misrepresentations about Ms. Schumacher's income and personal finances. The loan officer who originated Ms. Schumacher's mortgage loan facilitated and knowingly participated in the misrepresentations. Countrywide knew of the misrepresentations or would have known of them had it not engaged in

20

reckless, unreasonable underwriting practices.

107.   Pursuant to the Flow Policy, including §§ 2.2, 2.3, 2.4, 4.4 and 4.11, MGIC is entitled to deny or rescind coverage of this claim.

*MGIC Certificate No. 24612529*

108.   MGIC incorporates by reference paragraphs 1 through 26.

109.   This claim arises out of Elizabeth Walker's refinancing of her home in Sylvan Lake, Michigan. According to the borrower's application provided by Countrywide to MGIC, Ms. Walker was an administrative assistant for Oakland County, and earned $4,800 per month. The Countrywide insurance application file reported that Countrywide, acting through loan officer Dan Chiapelli, provided a $231,000 mortgage loan to refinance Ms. Walker's home. Based on Ms. Walker's reported salary and monthly debt service, her loan carried a DTI ratio of 47.65%. Based on the representations in Countrywide's insurance application, MGIC agreed to insure the loan under the Flow Policy and issued a certificate of insurance.

110.   Ms. Walker defaulted on her Countrywide mortgage loan and Countrywide submitted a claim to MGIC for insurance coverage.

111.   After receiving Countrywide's insurance claim, MGIC investigated the claim and uncovered the following facts. First, contrary to Countrywide's insurance application, Ms. Walker did not earn $4,800 per month, as Countrywide represented. Instead, Ms. Walker's monthly income was approximately $2,500.

112.   Ms. Walker reported that she disclosed her true income to Mr. Chiapelli. Mr. Chiapelli falsely assured Ms. Walker that she earned enough to qualify for refinancing and assured her that her monthly loan payment would be $650 per month.

113.   Based on Ms. Walker's true income and her $2,287 monthly debt obligation, her loan carried a DTI ratio 91.19%.

114.   A DTI ratio of 91.19% far exceeds the maximum DTI ratio established by MGIC's eligibility criteria, and this loan was therefore ineligible for MGIC insurance coverage. Countrywide's application for insurance materially misrepresents Ms. Walker's income. The

21

loan officer who originated Ms. Walker's mortgage loan facilitated and knowingly participated in the misrepresentations. Countrywide knew of the misrepresentations or would have known of them had it not engaged in reckless, unreasonable underwriting practices.

115.   Pursuant to the Flow Policy, including §§ 2.2, 2.3, 2.4, 4.4 and 4.11, MGIC is entitled to deny or rescind coverage of this claim.

### Prayer For Relief

MGIC requests that the Arbitrator order that MGIC is entitled to rescind or deny coverage of all disputed claims under the Flow Policy, including without limitation the ten representative claims above and the disputed claims listed in Exhibit B to this Demand, and provide such other relief as the Arbitrator deems appropriate.

DATED:        February 24, 2010          BARTLIT BECK HERMAN
                                         PALENCHAR & SCOTT LLP

                                         By_____
                                            Jeffrey A. Hall
                                            Joseph C. Smith, Jr.
                                            Andrew C. Baak
                                            Ashley C. Keller

                                         54 W. HUBBARD, SUITE 300
                                         CHICAGO, IL 60654
                                         Telephone:    (312) 494-4400
                                         Facsimile:    (312) 494-4440
                                         jeff.hall@bartlit-beck.com
                                         andrew.baak@bartlit-beck.com
                                         ashley.keller@bartlit-beck.com

                                         1899 Wynkoop Street, 8th Floor
                                         Denver, CO 80202
                                         Telephone:    (303) 592-3100
                                         Facsimile:    (303) 592-3140
                                         joseph.smith@bartlit-beck.com

                                         Attorneys for Claimant

22

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 24th day of February, 2010, the **MORTGAGE GUARANTY INSURANCE CORPORATION'S DEMAND FOR ARBITRATION** was submitted to the American Arbitration Association and was served upon the following counsel for Respondents by electronic mail and by Federal Express:

David M. Halbreich
REED SMITH LLP
355 SOUTH GRAND AVENUE
SUITE 2900
LOS ANGELES, CA 90071
TELEPHONE: (213) 457-8000
FACSIMILE: (213) 457-8080
dhalbreich@reedsmith.com

David E. Weiss
REED SMITH LLP
101 SECOND STREET, SUITE 1800
SAN FRANCISCO, CA 94105-3659
TELEPHONE: (415) 543-8700
FACSIMILE: (415) 391-8269
dweiss@reedsmith.com

Attorneys for Respondents
COUNTRYWIDE HOME LOANS, INC. and
BAC HOME LOANS SERVICING, LP

Anita J. Seggelink